## Bruce J. Levinsky v. M. Jerome Diamond, et al.

[559 A.2d 1073]

No. 85-551

Present: Barney, C.J. (Ret.), Underwood, J. (Ret.), Bryan, Supr. J., and Costello, D.J. (Ret.), Specially Assigned

Opinion Filed February 17, 1989

*T. Christopher Greene* of *Richard E. Davis Associates, Inc.,* Barre, for Plaintiff-Appellant.

*Robert D. Rachlin, Leo A. Bisson, Jr., Robert B. Luce* and *Richard N. Bland* of *Downs Rachlin & Martin,* Burlington, for Defendant-Appellee Diamond.

*Fred I. Parker* and *Thomas Z. Carlson* of *Langrock Sperry Parker & Wool,* Burlington, for Defendant-Appellee Linton.

*Stephen A. Dardeck* and *William A. Hunter* of *Tepper and Dardeck,* Rutland, for Defendant-Appellee Amestoy.

*Latham, Eastman, Schweyer & Tetzlaff,* Burlington, for Defendant-Appellee McKenzie.

*Robert S. DiPalma* of *Paul, Frank & Collins, Inc.,* Burlington, for Defendant-Appellee Wilson.

**Barney, C.J.** (Ret.), Specially Assigned. In the underlying litigation, plaintiff alleged that defendant state officials committed a series of tortious acts and deprived him of his constitutional rights during the course· of a Medicaid fraud investigation and prosecution. Defendants moved for summary judgment on all counts, and the superior court granted their motions on grounds of sovereign and official immunity. Plaintiff appeals, and we affirm.

## I.

The background of the action is complicated. The facts which follow are derived from plaintiff's pleadings and supporting docu-

ments and, with one exception,[1] were not disputed by defendants for purposes of the motions for summary judgment. See V.R.C.P. 56(e) (summary judgment may be granted on uncontroverted facts if appropriate); *Cavanaugh* v. *Abbott Laboratories,* 145 Vt. 516, 520, 496 A.2d 154, 157 (1985).

The situation commenced in the late 1970s with an investigation into the operation of several Vermont nursing homes owned in part by plaintiff. This investigation was conducted by defendant Diamond as Attorney General. Defendant McKenzie was deputy attorney general, and defendants Amestoy and Linton were assistant attorneys general. Defendant Wilson was then Commissioner of Social Welfare and obligated by law to administer the federal Medicaid program, which provided for the payment of some $17,000,000 to nursing home operators in Vermont during 1979. The stated basis of the investigation was the possibility of fraud in the reporting of nursing home expenses.

In July 1977, the investigators learned that a contractor who had worked for the nursing home operation was claiming that he had done work at plaintiff's personal residence which plaintiff had ordered charged to a nursing home account, The contractor also alleged that plaintiff had requested him to testify falsely at an inquest that was part of the ongoing fraud investigation.

In the spring of 1978, defendant Linton subpoenaed certain accounting records belonging to plaintiff which were then in the possession of a private accountant. The accountant had been hired by the State Nursing Home Rate Setting Committee to audit plaintiff's cost reports. The accountant, to whom plaintiff had voluntarily turned over the records in question, surrendered them to the Attorney General's office without notice to plaintiff.

Plaintiff was confined in federal facilities in Pennsylvania from May 1, 1978 through June 28, 1978 for Medicaid fraud, and did not return to Vermont upon his release. In July, investigators were informed by an airline executive that plaintiff had purchased tickets to Bermuda and Chile, and further checking in the vicinity of plaintiff's home in East Warren, Vermont revealed that plaintiff had planned an extended absence from the area.

---

[1] The one exception, which reflects a dispute between plaintiff and defendants as to exactly when one particular press conference was held, is described more fully in footnote 4, below.

On August 1, 1978 — more than a year after the investigators learned of the nursing home contractor's allegations — the Attorney General's office brought charges against plaintiff for suborning perjury and for inciting a felony. A press conference was then held at which defendants Diamond and Linton announced the filing of the charges and that a "warrant on the charges was issued across the United States and Canada" because it was feared the defendant might try to flee the country.

It was not until August 2, however, that defendant Amestoy, with the knowledge of Linton and Diamond, obtained the federal fugitive warrant referred to at the press conference The supporting allegation was that plaintiff knew of the state charges being filed against him and was seeking to flee. Plaintiff, however, had not been advised that charges were being filed and, in fact, was going on a long-planned vacation. He did not learn of the charges until later in August, when he was already in Bermuda.

In September 1978, defendants Linton and Wilson appeared before the legislative Joint Fiscal Committee to seek approval of an application for federal funds to create a Medicaid Fraud Unit under the supervision of the Attorney General's office. The request was denied at that time.

On October 3rd, defendant Linton filed an information against plaintiff charging him with ten counts of obtaining money by false pretenses. This was followed by another press conference, called by defendant Diamond, at which he stated that plaintiff had converted $94,000 to his own use by means of fraudulent cost reporting for Medicaid reimbursement Defendant Wilson, who was present at the conference, commented that the earlier federal conviction for Medicaid fraud had been "procedural" but that now they had "gone a step further" by showing "where [the money] went and how it was spent."

Later in October, defendant Wilson again appeared before the Joint Fiscal Committee and asked them to reconsider their earlier denial of funding for the requested fraud unit. At this appearance Wilson spoke about the pending prosecution of plaintiff as evidence of the need for the unit. Defendants McKenzie and Amestoy attended this committee meeting as well.

Plaintiff returned to Vermont in November 1978 and was arraigned on the pending charges. At the bail hearing, defendants Linton and Amestoy told the court that plaintiff had knowingly fled prosecution and that the weight of the evidence against him

was overwhelming. The bail was then set at $1.2 million, the highest ever for a Vermont criminal defendant at the time. Despite the prosecutor's representations at the bail hearing, in May of 1979 plaintiff was acquitted of the felony and perjury charges and, in August, the fraud charges were dropped upon plaintiff's payment of a $5,000 civil penalty and $25,000 expenses and attorneys' fees.

Plaintiff then brought this suit. In essence, he contends that he was the victim of a conspiracy, organized by the Attorney General's office, designed to "get" him, to provide publicity to defendant Diamond, and to gain support for the establishment of the Medicaid Fraud Unit.

In his ten-count complaint, plaintiff alleged that various of the defendants from the Attorney General's office violated his rights with respect to the state felony-perjury charges, the federal fugitive warrant, and the evidence at the bail hearing. He alleges that all the defendants injured him in connection with the filing of the "false pretenses" charges in October 1978 and with respect to the October hearing before the Joint Fiscal Committee.

The complaint charges that actions by defendants amounted to slander and libel and trespasses upon his constitutional rights. Among the counts listed in the complaint are infringement of the right to a fair trial, invasion of privacy, illegal search and seizure. violation of his right against self-incrimination, and deprivation of liberty and property without due process. These torts were advanced both as offenses under state law and as civil rights violations under 42 U.S.C. § 1983.

The trial court granted summary judgment in favor of all defendants. On the state claims, the court found that defendants Diamond, Amestoy, Linton and McKenzie were shielded from all liability under the doctrine of absolute immunity as prosecutors acting within the general scope of their authority. Defendant Wilson, as a public official with statutory authority, was also protected by absolute immunity for acts within the general authority of his office. The trial court also noted that under *Lomberg* v. *Crowley,* 138 Vt. 420, 423-24, 415 A.2d 1324, 1326-27 (1980), defendants, as state employees, were also protected by the provisions of 12 V.S.A. § 5602 governing sovereign immunity.

With respect to the § 1983 charges, the trial court found that prosecutor-defendants had absolute immunity under *Imbler* v. *Pachtman,* 424 U.S. 409 (1976), for all activities intimately associ-

ated with the decision to prosecute. As to the press conferences and the subpoena, it found only a qualified good-faith immunity attached because those activities were not within *Imbler's* narrow definition of advocative duties. In addition, the court concluded that since plaintiff failed to demonstrate any deprivation of a cognizable liberty or property interest, his § 1983 claims failed. On those bases, the trial court held that summary judgment was warranted in favor of defendants on the § 1983 allegations.

## II.

Broadly speaking, two types of immunities exist at common law to protect states and their employees from the consequences of their wrongful acts: sovereign immunity and official immunity. Sovereign immunity, derived from the concept that "the King can do no wrong," protects the state itself from suit except where the immunity has been expressly waived by statute. See generally W. Keeton, Prosser and Keeton on the Law of Torts § 131 (5th ed 1984).

That there is a distinction between sovereign immunity— which protects the state — and the doctrine of official immunity, which protects state employees in certain circumstances, was recognized in the recent case of *Libercent* v. *Aldrich,* 149 Vt. 76, 80, 539 A.2d 981, 983 (1987). In *Libercent,* we explicitly overruled that part of *Cronin* v. *State,* 148 Vt. 252, 257, 531 A.2d 929, 932- 33 (1987), which held that 12 V.S.A. § 5602's sovereign immunity extended to state employees. To the extent that *Cronin's* holding relied on *Lomberg* v. *Crowley,* 138 Vt. at 423-24, 415 A.2d at 1326-27, *Lomberg* was necessarily overruled.

We reiterate that the defense of sovereign immunity is available in Vermont only as to the state itself, to the extent the state has not waived its immunity under the provisions of 12 V.S.A. § 5601. To the extent that the trial court's judgment was dependent upon *Lomberg* v. *Crowley's* apparent extension of the doctrine of sovereign immunity to state employees, it was incorrect. This does not, however, change the result in this case.

## III.

Official immunity, unlike sovereign immunity, is available in some circumstances to shield public officials from lawsuits against them based on their activities. As the trial court noted in

its decision, the best articulation of the balance between the goals of redressing the evils done by public officials and promoting healthy decision-making by these officials was stated by Judge Learned Hand in *Gregoire* v. *Biddle,* 177 F.2d 579, 581 (2d Cir. 1949):

> It does indeed go without saying that an official, who is in fact guilty of using his powers to vent his spleen upon others, or for any other personal motive not connected with the public good, should not escape liability for the injuries he may so cause; and, if it were possible in practice to confine such complaints to the guilty, it would be monstrous to deny recovery. The justification for doing so is that it is impossible to know whether the claim is well founded until the case has been tried, and that to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties. . . . As is so often the case, the answer must be found in a balance between the evils inevitable in either alternative. In this instance it has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation.

The doctrine of official immunity was originally used in Vermont to insulate only judges from civil liability: "A judicial officer, acting within his jurisdiction and in a judicial capacity, is not liable in a private action for his judicial acts." *Banister* v. *Wakeman,* 64 Vt. 203, 207, 23 A. 585, 586 (1891). Over the years, the doctrine expanded to include not just judges but other public officers. See *Nadeau* v. *Marchessault,* 112 Vt. 309, 311-12, 24 A.2d 352, 354 (1942) (overseer of the poor for City of St. Albans, as public officer acting within authority conferred by law, shielded from civil liability); *Polidor* v. *Mahady,* 130 Vt. 173, 175, 287 A.2d 841, 843 (1972) (prosecutors immune from liability because "the issuance of criminal process . . . involves the exercise of that judgment and discretion based on factual inquiry characterized as judicial" in *Nadeau*).

The recent case of *Libercent* v. *Aldrich,* 149 Vt. 76, 539 A.2d 981, clarified Vermont's development of the doctrine of official immunity. In *Libercent,* we held that two degrees of official im-

munity would be recognized. Absolute immunity shields judges, legislators and the state's highest executive officers in cases where the acts complained of were performed within their respective authorities. When available, absolute immunity applies to any and all acts performed within the individual's authority. *Id.* at 81, 539 A.2d at 984. Lower-level officers, employees and agents are protected by qualified immunity, which extends to individuals (1) acting during their employment and acting, or reasonably believing they are acting, within the scope of their authority; (2) acting in good faith; and (3) performing discretionary, as opposed to ministerial acts. *Id.*: see *Ross* v. *Consumers Power Co.*, 420 Mich. 567, 633-34, 363 N.W.2d 641, 667-68 (1984); *Ferraro* v. *Earle*, 105 Vt. 243, 246, 164 A. 886, 888 (1933).

## IV.

Turning to the issues before us, we note that the function of this Court is to affirm the action of the trial court on any basis available and appropriate under our law. See *Gilwee* v. *Town of Barre*, 138 Vt. 109, 111, 412 A.2d 300, 301 (1980) (a trial court can achieve the right result for the wrong reason).

The state claims raised by plaintiff are made against defendant Diamond for acts performed while he was attorney general of this state, against defendants McKenzie, Amestoy and Linton for their actions as deputy and assistant attorneys general, and against defendant Wilson for his activities while commissioner of the Department of Social Welfare. Under the analysis outlined above, we must first consider which degree of immunity attaches to the offices held by the particular defendants.

Defendants Diamond and Wilson, as the "highest executive officers" in their respective governmental units (the Attorney General's office and the Department of Social Welfare). are both protected by absolute immunity if the acts complained of were performed within the general authority of those offices. Defendants Amestoy, Linton and McKenzie, as lower-level state employees, are entitled only to qualified immunity.

## A.

The scope of authority and general powers of the state's attorney general are as follows:

§ 152. Scope of authority

The attorney general may represent the state in all civil and criminal matters as at common law and as allowed by statute. The attorney general shall also have the same authority throughout the state as a state's attorney.

§ 153. General powers; deputy, assistants
(a) The attorney general shall have the general supervision of criminal prosecution [and] shall consult with and advise the state's attorneys in matters relating to the duties of their office . . . .

3 V.S.A. §§ 152, 153. Thus, the attorney general's authority is concurrent with that of state's attorneys under 24 V.S.A. § 361(a):

A state's attorney shall prosecute for offenses committed within his county, and all matters and causes cognizable by the supreme, superior and district courts in behalf of the state [and] file informations and prepare bills of indictment . . . .

See also *Office of State's Attorney* v. *Office of Attorney General*, 138 Vt. 10, 13, 409 A.2d 599, 601 (1979) (3 V.S.A. § 153 gives the two offices at least "equal authority to initiate criminal prosecutions"). In addition, the attorney general is authorized to employ and direct investigators. 3 V.S.A. § 154; see also 9 V.S.A § 2460 (attorney general authorized to conduct civil investigation in consumer fraud matters).

Plaintiff's state law claims against Diamond are based on the following events: the subpoenaing of the nursing home records from plaintiff's accountant, the filing of the felony-perjury charges on August 1, 1978 and the subsequent press conference, the procuring of the federal fugitive warrant, and the filing of the ten-count "false pretenses" information on October 3, 1978 and the subsequent press conference. In addition, plaintiff claims that defendant Diamond directed defendants Amestoy and Linton to make knowingly false statements at his bail hearing, and conspired with defendant Wilson in referring to those false charges at the October meting of the Joint Fiscal Committee.

The trial court found, and we agree, that Diamond's actions with respect to the subpoena, the felony-perjury charges, the federal fugitive warrant, the "false pretenses" information and the bail hearing were within his general scope of authority, which, by statute, includes investigating and prosecuting criminal actions on

behalf of the State of Vermont. As to these acts, he is shielded absolutely from any civil liability to plaintiff.

Defendant Diamond's actions in calling the two press conferences were not explicitly authorized by statute. However, where, as here, the conferences were devoted entirely to the prosecutions in question, we find that they are within the "outer perimeter of the prosecutor's authority and discretion," *Blake* v. *Rupe*, 651 P.2d 1096, 1106 (Wyo. 1982), *cert. denied*, 459 U.S. 1208 (1983); see also *Turner* v. *Baxley*, 354 F. Supp. 963, 972 (D. Vt. 1972) (promulgation of news releases were acts in furtherance of attorney general's governmental function as public prosecutor).

As to the conspiracy charge with respect to defendant Wilson and the legislative committee hearing, it was undoubtedly within the attorney general's general authority to testify before the Joint Fiscal Committee as to a matter closely connected to the funding of a new branch of his office, i.e., the proposed Medicaid Fraud Unit.[2] As to these acts, defendant Diamond is likewise protected from liability under the doctrine of absolute immunity.[3] In sum, the trial court's granting of defendant Diamond's motion for summary judgment was correct as a matter of law.

## B.

The state law claims against defendant Wilson are based on the following acts: his appearance before the Joint Fiscal Committee in September 1978 seeking funding for a Medicaid Fraud Unit, his appearance and statements at the October 4th press conference relating to the "false pretenses" information, and his appearance and statements before the Committee in late October,

---

[2] We note, without addressing the matter, that the Restatement (Second) of Torts § 590A (1976) declares that all statements made at a legislative hearing by any witness, public or private, are absolutely privileged. This "legislative witness immunity" has been adopted in numerous jurisdictions. See, e.g., *Webster* v. *Sun Co.*, 790 F.2d 157, 161 (D.C. Cir. 1986) (applying District of Columbia law); *In re IBP Confidential Business Documents Litigation*, 755 F.2d 1300, 1310-11 (8th Cir. 1985), *cert. denied*, 479 U.S. 1088 (1987); *Yip* v. *Pagano*, 606 F. Supp. 1566, 1571 (D.N.J. 1985) (applying New Jersey law); and *Bio/Basics International Corp.* v. *Ortho Pharmaceutical Corp.*, 545 F. Supp. 1106, 1114-16 (S.D.N.Y. 1982) (applying New York law) and state court cases cited therein.

[3] In his arguments, plaintiff points out that on the facts alleged, the prosecutions commenced by defendant Diamond were done with malice, knowing that the charges were baseless. Since Diamond is protected by absolute immunity, however, his motive is irrelevant.

again in pursuit of funding for a Medicaid Fraud Unit. These acts were all performed by Wilson in his capacity as the highest executive officer of the Department of Social Welfare.

The Department's statutory authority is to "administer all laws specifically assigned to it," 33 V.S.A. § 2504(a), which includes cooperating with federal agencies in receiving and administering federal funds available to it, 33 V.S.A. § 2504(b)(2). It is undisputed that the federal Medicaid program was administered pursuant to these provisions by the Department. Defendant Wilson, as the Department's commissioner, was required to exercise the powers necessary to the effective administration of the Department as well as to determine departmental policy. 33 V.S.A. § 2505(b).

Clearly, defendant Wilson's testimony before the legislative funding committee with respect to a proposed Medicaid Fraud Unit was within the scope of his general statutory authority, and he cannot be held liable for either his appearances or statements. As with defendant Diamond, his statements at the press conference were not as clearly within the purview of his office; again, however, his statements were restricted to alleged incidents of Medicaid fraud, an area intimately associated with his statutory duty. Although it presents a close question, we find that these statements were, under the circumstances, within the scope of his general authority. See *Glass* v. *Ickes*, 117 F.2d 273, 278 n.9 (D.C. Cir. 1940) (practice of cabinet officers to issue public statements regarding the activities of their departments serves a useful role in functioning of democratic processes).

Plaintiff also argues that in making his statements, Wilson used departmental records in violation of 33 V.S.A. § 2551(b)(2), which prohibits the use of records for political, commercial or unauthorized purposes. That use, plaintiff claims, requires the conclusion that Wilson was acting outside the scope of his authority. We disagree. Our analysis above demonstrates that Wilson's appearances and statements were within his general authority as Commissioner of Social Welfare, and one of his concerns was the funding and administration of Medicaid programs. Any such use of departmental records which may have had incidental political repercussions would nevertheless be protected, absolutely, under the immunity available to Wilson as a "highest executive officer."

Thus, under the doctrine of absolute immunity as stated in *Libercent* v. *Aldrich*, both Diamond and Wilson are absolutely

immune from civil liability with respect to the acts complained of by plaintiff.

## C.

Because defendants Amestoy, Linton and McKenzie, as lower-level state employees, are entitled to qualified immunity only, we must analyze their acts under the test set out by *Libercent,* 149 Vt. at 81, 539 A.2d at 984. The alleged actions of these assistant attorneys general at issue are as follows:

Amestoy: (1) furnishing information to federal authorities leading to the issuance of the fugitive warrant;
(2) his participation in calling the October 4th press conference;
(3) his appearance and statements at the October meeting of the Joint Fiscal Committee hearing; and
(4) his presence at the bail hearing.

Linton: (1) the decision to file the felony-perjury charges and "false pretenses" charges;
(2) his subpoenaing plaintiff's accounting records;
(3) his participation in the press conferences;
(4) his participation at the Joint Fiscal Committee hearing;
(5) his participation in obtaining the federal warrant; and
(6) statements at the bail hearing.

McKenzie: (1) his presence at the October 4th press conference;
(2) his presence, and his failure to correct defendant Wilson's comments, at the October legislative committee hearing.

Our first inquiry is whether these acts were performed in the course of their employment as deputy or assistant attorneys general, and whether defendants were (or reasonably believed they were) acting within the scope of their authority.

The authority of the deputy attorney general is outlined at 3 V.S.A. § 153(b) and, for our purposes, is co-extensive with the authority of assistant attorneys general under 3 V.S.A. § 153(c) and with state's attorneys under 24 V.S.A. § 361(a) (see Section IV(A) above). The deputy's responsibilities include performing

such duties as the attorney general directs, while the assistants' duties include aiding him in the "proper and efficient performance" of his department. 3 V.S.A. § 153(b) and (c).

Since the scope of their general authority with respect to criminal investigations is co-extensive with that of the attorney general, it is clear from our previous discussion that their activities in subpoenaing records, filing charges, pursuing a federal warrant, and statements at the bail hearing were within their employment and authority. Likewise, they either were, or could reasonably have believed they were, acting within the scope of their authority in attending the press conferences called by the attorney general with respect to these prosecutions.

Our next inquiry is whether these acts were done in good faith. In applying the good-faith test to issues of qualified immunity, we adopt the standard enunciated in *Harlow* v. *Fitzgerald,* 457 U.S. 800 (1982), in which the U.S. Supreme Court embraced an objective test for ascertaining the existence or absence of bad faith:

> [B]are allegations of malice should not suffice to subject government officials either to the costs of trial or to the burdens of broad-reaching discovery. . . . [G]overnment officials performing discretionary functions[] generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.
>
> Reliance on the objective reasonableness of an official's conduct, as measured by reference to clearly established law, should avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment.

*Id.* at 817-18. Thus, good faith will be found where the official's acts did not violate clearly established statutory or constitutional rights of which the official should reasonably have known.

Plaintiff claims that defendant Linton's participation in the press conference held on August 1 demonstrates malice with respect, at least, to the filing of the federal fugitive from justice warrant, since a statement was made that "a warrant on the charges was issued across the United States and Canada," while

the federal warrant was not actually obtained until August 2nd.[4] While we agree that any such announcement may have been ethically improper if no warrant had yet been obtained, we cannot conclude that this alleged breach rises to the level of violating "clearly established statutory or constitutional rights" of plaintiff. Thus, applying the objective standard of *Harlow* v. *Fitzgerald,* 457 U.S. 800, in determining the propriety of the use of qualified immunity on this summary judgment motion, we conclude that no bad faith has been demonstrated.

So, too, we find that none of the alleged actions by the assistant attorneys general violated clearly established laws or rights, and we thus conclude that they also meet the second prong of the qualified immunity test.

Our last inquiry is whether the acts complained of constituted discretionary, as opposed to ministerial, acts. A "discretionary" act, for purposes of this issue, is one requiring the exercise of judgment in its performance. *Libercent* v. *Aldrich,* 149 Vt. at 81, 539 A.2d at 984. While we acknowledge that the line drawn between discretionary acts and ministerial acts will often be a fine one, aid can be found in the relevant case law. For example, in *Ross* v. *Consumers Power Corp.,* 420 Mich. at 634-35, 363 N.W.2d at 668, the Supreme Court of Michigan looked to the level of decision-making involved in the acts at issue, and further clarified the pertinent categories by distinguishing between acts which are "discretionary-decisional" and those which are "ministerial-operational." Even this analysis provides no definitive test, for ministerial-operational acts may still entail some minor decision-making responsibilities. *Id.*

With that analysis in mind, we conclude that the acts complained of with respect to each assistant attorney general were discretionary, not ministerial. The decision to investigate and prosecute involved significant professional judgment, as did the related activities regarding publicity. We cannot conclude that any of these actions were so "ministerial-operational" as to deprive the actors of qualified immunity.

---

[4] In their briefs, defendants assert that the press conference occurred after the federal warrant had been obtained on August 2nd. In light of our conclusion that this alleged action by defendants does not violate any clearly established rights of plaintiff, the issue of fact presented here is not material and thus cannot defeat defendants' motions for summary judgment.

The only remaining activity not disposed of by the foregoing evaluation is the appearance by defendants Amestoy and McKenzie before the Joint Fiscal Committee in pursuit of funding for the proposed Medicaid Fraud Unit. To the extent that we found such an appearance by the attorney general to be within his scope of authority, see Section IV(A), we conclude that appearances by Amestoy and McKenzie were within the scope of their general authority as his duly authorized and appointed assistants. Their appearance, and any comments they made, could in no way be characterized as ministerial. Rather, any testimony they gave to the Committee was discretionary in nature as depending on matters of professional judgment. In addition, their appearance violated no clearly established rights of plaintiff. Thus, defendants are protected by the doctrine of qualified immunity for any civil liability arising out of their appearances or statements before the Joint Fiscal Committee.

## V.

A different analysis altogether must be used in reviewing whether the various defendants are shielded by immunity doctrines from plaintiff's charges of civil rights violations under 42 U.S.C. § 1983,[5] since our state immunity doctrine as set forth in *Libercent* differs from that employed in examining federal constitutional claims. The federal claims made by plaintiff are based on the same acts outlined at length above, but instead of alleging slander, libel, and defamation, plaintiff claims that his civil rights were violated by the unconstitutional deprivation of his rights to privacy, a fair trial, and to travel.

The immunity doctrine developed with respect to § 1983 actions, like our state law doctrine, is directed at reaching the fairest resolution of the tensions inevitably arising between an individual's right to redress and a government official's need to exercise the rights and obligations of public office without fear of exposing himself to vengeful lawsuits. In making decisions as to whether immunity should be available, courts must be careful to balance those competing rights against the public policy issues implicated.

---

[5] In brief, 42 U.S.C. § 1983 provides that every person who acts under color of state law to deprive another of a constitutional right shall be answerable to that person in a suit for damages. See *Imbler* v. *Pachtman,* 424 U.S. at 417.

Absolute immunity in § 1983 actions is not available to all "high officials," as it is under Vermont common law. Instead, courts have generally adopted the more traditional approach of granting absolute immunity to judges, legislators, and those involved in "quasi-judicial" functions. See, e.g., *Pierson* v. *Ray*, 386 U.S. 547, 554-55 (1967) (preserved common-law absolute immunity for judges under § 1983 actions); *Tenney* v. *Brandhove*, 341 U.S. 367, 377 (1951) (state legislators absolutely immune). Qualified immunity is available, in certain circumstances, to executive officials and other lower-level employees. See, e.g., *Scheuer* v. *Rhodes*, 416 U.S. 232, 247 (1974) (governor and other state executive officials had qualified immunity varying with "the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action"); *Wood* v. *Strickland*, 420 U.S. 308, 322 (1975) (school officials not liable for imposing disciplinary penalties if could not reasonably have known that actions violated clearly established constitutional rights and they acted without malice).

Thus, we turn to an examination of whether the defendants in this action are protected, either absolutely or qualifiedly, by virtue either of their positions or their activities, from civil liability to plaintiff under 42 U.S.C. § 1983.

Under the case of *Imbler* v. *Pachtman*, 424 U.S. 409, prosecutors are protected by absolute immunity from § 1983 liability for all acts "intimately associated with the judicial phase of the criminal process." *Id.* at 430. The U. S. Supreme Court did not, however, consider whether similar policy reasons require immunity for prosecutors acting not as an advocate, but as an administrative or investigative officer. Rather than focus on the status of the prosecutorial defendants per se, then, we are to make a "functional" analysis focusing on the nature of their acts.

Using the functional analysis approach, we conclude, as did the trial court, that the prosecutorial defendants (Diamond, Amestoy, Linton and McKenzie) were all protected by absolute immunity for their actions in filing the state and federal charges.[6] Whether the decisions to prosecute and the prosecutions themselves were malicious is irrelevant, since a good-faith test is im-

---

[6] Plaintiff claims that the filing of the federal fugitive from justice warrant constituted a § 1983 violation in that it deprived him of his right to travel freely. We do not reach this question in light of our finding that absolute immunity attaches to the prosecutors' actions in obtaining this warrant.

posed only when qualified immunity is available (see discussion below).

With respect to the alleged unlawful search and seizure of plaintiff's accounting records, the trial court concluded that the activity was not so "intimately associated" with the subsequent prosecution as to render it part and parcel of the prosecutorial function, since it was only investigatory in nature. We disagree. This does not present a case where prosecutors helped plan and execute a raid, *Hampton* v. *Hanrahan,* 600 F.2d 600 (7th Cir. 1979); instead, it involved an activity legally sanctioned as part of the investigative process, a process necessary to the effective operation of the prosecutors' office. As such, in the circumstances presented by this case, the act of subpoenaing plaintiff's records was absolutely protected.[7]

■ It is clear, under the functional analysis method, that the press conferences and appearances before the Joint Fiscal Committee by the prosecutors are not so "intimately associated" with the act of prosecuting criminals as to warrant absolute immunity from § 1983 liability. As to those activities, therefore, they are entitled only to qualified immunity. Similarly, since defendant Wilson is neither a judge, legislator nor prosecutor, he too is entitled only to qualified immunity. See *Scheuer* v. *Rhodes,* 416 U.S. at 247 (qualified immunity is available to officers of the executive branch in varying scope, depending upon scope of discretion, responsibility of office, and circumstances at time of acts complained of).

In order to determine whether qualified immunity will safeguard the defendants as to the press conferences and committee hearings, a three-part test similar to that applied under the state

---

[7] The trial court expressed its concern that extending absolute immunity in § 1983 actions to such investigatory acts might lead to greater constitutional violations in investigations, since prosecutors would be able to afford themselves absolute immunity by the " mere filing of charges" subsequent to an otherwise unlawful investigation. While such abuse is possible, public policy dictates that a prosecutor — absolutely protected under *Imbler* from liability for the actual act of prosecuting — must be afforded reasonable means to reach the decision to prosecute without fear of legal retaliation.

Here, the subpoena did not constitute a random "fishing expedition," but was served as part of an investigation already in progress. We are not presented with, nor do we here decide, whether the act of serving a subpoena is always part of an investigatory process and thus within the parameters of the immunities outlined in this case.

doctrine of qualified immunity must be met: the conduct must have been within the scope of official duties, discretionary in nature, and characterized by objective good faith. See *Harlow* v. *Fitzgerald*, 457 U.S. at 818; see also *Mitchell* v. *Forsyth,* 472 U.S. 511, 524 (1985) (not liable unless actions violate clearly established statutory or constitutional rights of which a reasonable person would have known).

While not "intimately associated" with the prosecutorial function, we conclude that it was still within the scope of defendant Diamond's general authority as attorney general of the State of Vermont to call press conferences relating directly to prosecutions arising out of his office's activities. By extension, this general authority attaches to the other three defendants, who were acting as his assistants. For the reasons articulated in Section IV(B) of this opinion, we also conclude that it was within defendant Wilson's scope of general authority to be present at the conferences, since his office had reason to be closely connected to the ongoing Medicaid fraud investigation.

Similarly, our previous treatment of the discretionary nature of these activities, as well as our finding that there were no violations of clearly established laws or constitutional rights under the good faith standard enunciated in *Harlow* v. *Fitzgerald,* leads us to the conclusion that qualified immunity shields all defendants from liability for attendance or statements at the press conferences.

The only remaining claim to examine with respect to questions of immunity involves appearances and statements by the two assistant attorneys general and by defendant Wilson at the legislative committee hearings. For the reasons enunciated in Sections IV(B) and (C) above, we conclude that with respect to § 1983 liability, those actions were within the scope of defendants' general authority, discretionary in nature, and not in bad faith.

## VI.

The trial court, finding that the defendants were protected only by qualified immunity with regards to the press conferences and legislative committee appearances, nevertheless disposed of plaintiff's § 1983 claims on the ground that "summary judgment is appropriate because [the] claims do not present cognizable constitutional infringements." Plaintiff claimed, as his injuries, that the

conspiracy and defamation by defendants interfered with his business opportunities, invaded his right to privacy, and undermined his right to a fair trial.

In *Paul* v. *Davis*, 424 U.S. 693 (1976), the U.S. Supreme Court held that a plaintiff cannot sustain a § 1983 action on a claim of defamation without an accompanying deprivation of a cognizable liberty or property interest. *Id.* at 709 ("we do not think that such defamation, standing alone, deprived [plaintiff] of any 'liberty' protected by the procedural guarantees of the Fourteenth Amendment."). Plaintiff argues that there need not be such actual deprivation, but rather, only the stigmatizing defamation "plus something more tangible than personal reputation alone," in order to find a § 1983 violation. But this ignores the language of the enabling statute, which mandates liability for the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Thus, we agree with the trial court that more than "stigma plus" must be shown before a cognizable § 1983 claim arises. See also *Mosrie* v. *Barry,* 718 F.2d 1151, 1162 (D.C. Cir. 1983) (the reaction of others to unfavorable publicity about a person is not a change in legal status rising to the level of a constitutional deprivation within the meaning of *Paul* v. *Davis*); *Hopper* v. *Hayes,* 573 F. Supp. 1368, 1371 (D. Idaho 1983) ("[I]n order to state a claim for relief under Section 1983, the '[p]laintiff must allege and prove both a conspiracy and an actual deprivation of rights.'") (quoting *Hampton* v. *Hanrahan,* 600 F.2d at 622).

■ We turn first to plaintiff's claim that his right to trial by jury was infringed. As the trial court pointed out, however, there can be no claim on this issue since the trial that was held resulted in acquittal and/or dismissal of all charges. While plaintiff claims that acquittal and dismissal is not equivalent to a fair trial, the trial court was correct in stating that any constitutional deprivation was mooted by the trial's result. In addition, the case relied on by plaintiff, *Powers* v. *Coe,* 728 F.2d 97, 102 (2d Cir. 1984), turned on a different concern: the possibility of a guilty plea coerced by fear of a jury made partial by prosecutorial misconduct. The jury in this case acquitted. We find no constitutional deprivation in any sense. See *Symkowski* v. *Miller*, 294 F. Supp. 1214, 1216 (E.D. Wis. 1969).

■ Plaintiff contends that the defamatory remarks of defendants interfered with his prospective business operations. Again,

however, we agree with the trial court's conclusion that any such future loss is too speculative to be cognizable under § 1983.

■ Similarly, *Paul* v. *Davis*, 424 U.S at 713, holds that defamation by public officials does not represent the kind of privacy interest implicated in "the concept of ordered liberty" as described in *Palko* v. *Connecticut*, 302 U.S. 319, 325 (1937); see also *Roe* v. *Wade*, 410 U.S. 113, 152 (1973). On that basis, the trial court concluded that there was no cognizable claim of invasion of privacy. Plaintiff argues, however, that there is a special guarantee under the Vermont Constitution qualifying defamatory injury for § 1983 protection. He relies on Chapter 1, Article 4, which provides:

> Every person within this state ought to find a certain remedy, by having recourse to the laws, for all injuries or wrongs which he may receive in his person, property or character; he ought to obtain right and justice, freely, and without being obliged to purchase it; completely and without any denial; promptly and without delay; conformably to the laws.

It is plaintiff's contention that, unlike the facts in *Paul* v. *Davis*, which dealt with Kentucky law, the Vermont constitutional provisions give substantive law protection to "character," thereby making it a protected liberty interest within the meaning of § 1983.

The cited Vermont constitutional provision has never been held by this Court, however, to give rise to a substantive constitutional right. Instead, it has been treated as the Vermont equivalent of the federal Due Process Clause. See, e.g., *Vincent* v. *Vermont State Retirement Board*, 148 Vt. 531, 534 n.2, 536 A.2d 925, 927-28 n.2 (1987); *State* v. *Dean,* 148 Vt. 510, 514-15, 536 A.2d 909, 913 (1987); *State* v. *Hall*, 145 Vt. 299, 308, 487 A.2d 166, 171 (1984); *State* v. *Mecier*, 145 Vt. 173, 182, 488 A.2d 737, 743 (1984). As such it protects recourse to the judicial process but does not rise to the level of establishing a fundamental privacy right, and we decline to do so here.

In fact, it is instructive to note that the Kentucky Constitution has a clause parallel to that in our constitution, stating:

> All courts shall be open, and every person for an injury done him in his lands, goods, person or reputation, shall have a remedy by due course of law, and right and justice administered without sale, denial or delay.

Ky. Const. § 14. In spite of, and presumably with full knowledge of, this parallel, the U.S. Supreme Court found in *Paul* v. *Davis* that no substantive right had been violated. Likewise, we find that Chapter 1, Article 4 of the Vermont constitution secures plaintiff no substantive, protected liberty interest sufficient to withstand defendants' motions for summary judgment as to the § 1983 claims.

## CONCLUSION

The doctrine of official immunity has existed, in one form or another, throughout the history of Vermont jurisprudence. See, e.g., *Davis* v. *Strong*, 31 Vt. 332 (1858); *Gregory* v. *Bugbee*, 42 Vt. 480 (1869); *Banister* v. *Wakeman*, 64 Vt. 203, 23 A. 585; *Nadeau* v. *Marchessault*, 112 Vt. 309, 24 A.2d 352; *Polidor* v. *Mahady*, 130 Vt. 173, 287 A.2d 841. Today's opinion further clarifies our most recent exposition of the function of official immunity as set forth in *Libercent* v. *Aldrich*, 149 Vt. 76, 539 A.2d 981.

We recognize that the use of the doctrine may, at times, produce harsh results. As the U.S. Supreme Court stated in *Imbler* v. *Pachtman* with respect to the immunity attaching to prosecutors under § 1983 actions,

> [t]o be sure, this immunity does leave the genuinely wronged defendant without civil redress against a prosecutor whose malicious or dishonest action deprives him of liberty. But the alternative of qualifying a prosecutor's immunity would disserve the broader public interest. It would prevent the vigorous and fearless performance of the prosecutor's duty that is essential to the proper functioning of the criminal justice system.

424 U.S. at 427-28. So, too, may the absolute immunity attaching under our state law to judges, legislators and "highest" public officials leave wronged plaintiffs without civil redress.

Similarly, our adoption of the objective good-faith test enunciated in *Harlow* v. *Fitzgerald* to determine whether other state employees are protected by qualified immunity may safeguard defendants whose actions were subjectively motivated by malicious intent. We recognize this possibility, but must weigh the potential harm against the public's interest in the efficient and dedicated performance by public officials of their duties and obligations.

Were we to adopt a subjective standard when inquiring into an official's good faith, a material issue of fact would always be present, precluding summary judgment and forcing lower-level state employees to undergo, at the very least, extensive discovery and motion practice in defending their actions.

It is not in the public interest to expose state employees to the distraction and expense of such litigation. The costs associated with a defense of subjective good faith are not only the obvious legal ones, but intangible costs which filter through to us all: the employee's distraction from duties, an inhibition of the performance of discretionary acts, deterrence from going into public service. These factors, upon which the U.S. Supreme Court based its objective standard in *Harlow* v. *Fitzgerald,* have likewise prompted us to adopt that standard. Our hope is that in doing so, public officials will be relieved of the necessity of defending, on the merits, all but the most substantial claims against them.

As the *Harlow* Court stated:

> By defining the limits of qualified immunity essentially in objective terms, we provide no license to lawless conduct. The public interest in deterrence of unlawful conduct and in compensation of victims remains protected by a test that focuses on the objective legal reasonableness of an official's acts. . . . But where an official's duties legitimately require action in which clearly established rights are not implicated, the public interest may be better served by action taken "with independence and without fear of consequences."

457 U.S. at 819 (quoting *Pierson* v. *Ray*, 386 U.S. at 554).

As Judge Learned Hand so aptly stated, it would be monstrous to deny recovery if it were possible, in practice, to confine complaints of wrongdoing to those in fact guilty of misuse of power or authority. *Gregoire* v. *Biddle*, 177 F.2d at 581. Since that cannot be done, our answer has historically been, and continues to be, to attempt to balance the competing interests by delineating doctrines of immunity which will best allow public officials the freedom necessary to perform their obligations without fear of retaliation.

*Affirmed.*