## Stanley LaFlamme v. Essex Junction School District and Essex Junction Prudential Committee

[750 A.2d 993]

No. 97-493

Opinion Filed January 21, 2000

Motion for Reargument Denied May 2, 2000

Present: Amestoy, C.J., Dooley, Morse and Skoglund, JJ., and Allen, C.J.(Ret.), Specially Assigned

476

*Edwin L. Hobson,* Burlington, for Plaintiff-Appellee.

*Douglas C. Pierson* and *Thomas M. Higgins* of *Pierson, Wadhams, Quinn & Yates,* Burlington, for Defendants-Appellants.

**Morse, J.** Defendants Essex Junction School District and Essex Junction Prudential Committee (school board) appeal a jury verdict awarding plaintiff Stanley LaFlamme damages for violation of his right to procedural due process under 42 U.S.C. § 1983. Because the evidence was insufficient to support such a claim as a matter of law, we reverse.

This controversy arose when the Essex Junction Prudential Committee, which functions as the school board for the Village of Essex Junction, publicly "censured" LaFlamme, who had been elected to the Prudential Committee in May 1994. Conflict and tension between LaFlamme and other committee members plagued his tenure. For example, members considered LaFlamme difficult to work with and disruptive of committee proceedings. The committee particularly took umbrage at LaFlamme's participation in a May 1995 meeting of the Village of Essex Junction Board of Trustees, at which the formation of a union high school was discussed. During the meeting, LaFlamme offered opinions that, in the Prudential Committee's view, were inaccurate, offensive, and belied its position.

In February 1995, the Chair of the Prudential Committee, Leslie Mooney, sought advice concerning the committee's working relationship with LaFlamme from the Executive Director of the Vermont School Board Association. According to Mooney, the committee

considered the possibility of censuring LaFlamme because the members had been unsuccessful in their several attempts to discuss with him issues concerning his committee membership.

The committee held a special meeting on May 30, 1995, which LaFlamme did not attend. While in executive session, the members discussed the ramifications of censure. They agreed to publicly censure LaFlamme during the next regularly scheduled meeting, subject to the approval of the committee's legal counsel.

Following the meeting, Mooney discussed with the committee's counsel the logistics for censuring LaFlamme. Counsel informed Mooney that the committee was not required to publicly warn LaFlamme of the upcoming censure. She and another member drafted the censure motion and marked it on the agenda as a code of ethics discussion to avoid attracting attention and turning the matter into a "circus."

On June 12, 1995, the Prudential Committee held a regularly scheduled meeting, which LaFlamme attended. The committee, again in executive session, presented him with the censure motion. Its substance read in pertinent part:

> After viewing the tape of the Village Trustees meeting of May 23, the consensus of the members present . . . was to protect the public's interest by censuring Stan LaFlamme for violating [Vermont School Boards Association] and [National School Boards Association] Code of Ethics, district policy, and standards of good boardsmanship. The board has previously attempted to discuss these concerns with Mr. LaFlamme in executive session, but he was unwilling to do so.
>
> I [James Riley, who read the motion] make a motion that Stan LaFlamme be reprimanded for failing to uphold the following tenets of the codes of ethics:
>
> 1. *Attend all regularly scheduled board meetings insofar as possible, and become informed concerning the issues to be discussed at those meetings.* Mr. LaFlamme failed to attend several meetings, has left meetings before adjournment, and has failed to attend executive sessions at which information critical to sound decision-making was presented. He has indicated to two board members that he does not intend to attend any further executive sessions.

2. *Abide by board decisions regardless of how individuals voted.* Mr. LaFlamme spoke publicly against the board-approved draft budget. He also supported the village trustees in opposing the Union High School at their May 23 meeting despite the unanimous vote of the Prudential Committee to support the Union.

3. *Listen to legal counsel and constructive criticism to protect the board and the school system from liability.* Mr. LaFlamme has made public unsubstantiated allegations which have exposed the district to liability.

4. *Accept the responsibility to secure facts before arriving at conclusions.* Mr. LaFlamme corroborated the inaccurate data presented at the trustees meeting, and his statements about teacher job security were not factual.

5. *Board policies BBAA Board member Authority and BBFA Conflict of Interest state in part that "an individual board member, including the Chairman, shall have power only when the board, by vote, has delegated authority to him or her."* Mr. LaFlamme invited the trustees to make their presentation at [t]he Prudential Committee hearing without authorization from the Board. Under procedure BD-R, board meeting agendas are established by the Chair and the Superintendent.

6. Good boardsmanship requires that each member take on a fair share of the workload, including committee assignments. Mr. LaFlamme has not fulfilled his responsibilities around sub[-]committee work.

(Emphasis in original.)

Mooney explained to LaFlamme that, unless he was willing to discuss the committee's concerns, it was prepared to vote on the censure motion during the regular meeting. LaFlamme responded by noting that the motion could not properly be brought during executive session. At that point, the executive session ended and the Prudential Committee resumed its meeting in public.

Committee member James Riley read the motion in its entirety, after which LaFlamme spoke in his own defense. LaFlamme took issue with many of the allegations made in the motion, and challenged in several respects the information upon which the allegations rested.

After hearing LaFlamme, the committee granted the motion to censure by a vote of four to one.

On July 21, 1995, LaFlamme sued defendants and the members of the Prudential Committee individually. The superior court dismissed the suit against the individuals on the basis of immunity afforded to municipal officers under 24 V.S.A. § 901(a). While this lawsuit was pending, LaFlamme served on the Prudential Committee a second year before resigning. During that year he made an unsuccessful bid for election to the Village Trustees.

LaFlamme raised three claims: (1) failure to accommodate handicap under 9 V.S.A. § 4502, (2) denial of the right to free speech, and (3) denial of the right to procedural due process. He withdrew a fourth claim alleging defamation.

The jury found in favor of defendants on the handicap accommodation and free speech claims, but awarded LaFlamme $75,000 compensatory and $25,000 punitive damages for violation of his right to procedural due process. In essence, the claim upon which the verdict was rendered, as evidenced by the jury instructions, was that the Prudential Committee damaged LaFlamme's reputation so severely "that his opportunity and ability to associate with others were significantly limited and that the damage resulted without due process of law." Defendants appeal on the ground that they were entitled to judgment as a matter of law.

Before reviewing the merits of the appeal, we explain the concept of censure as a method of discipline. In Vermont, school boards derive their power from statute. See *Cole v. Town of Hartford School Dist.*, 131 Vt. 464, 467, 306 A.2d 101, 103 (1973). There is no statutory provision expressly vesting school boards with the authority to censure one of its members. School boards may, however:

> approve or disapprove rules and regulations proposed by the principal or superintendent for the conduct and management of public schools in the district[;] . . . take any action, which is required for the sound administration of the school district[;] . . . exercise the general powers given to a legislative branch of a municipality[; and] . . . establish policies and procedures designed to avoid the appearance of board member conflict of interest.

16 V.S.A. § 563(1), (2), (15), (20). Also, Robert's Rules of Order govern the conduct of school board meetings. See 16 V.S.A. § 554. Accordingly, the Essex Junction School District adopted Robert's Rules to govern the conduct of all meetings.

As discussed in Robert's Rules, reprimand is one of several disciplinary actions an organization may undertake. See Sarah Corbin Robert, Robert's Rules of Order Newly Revised § 60, at 639 ("Punishments that a society can impose generally fall under the headings of reprimand, fine . . ., suspension, or expulsion."). Censure is a form of reprimand, defined as "[t]he formal resolution of a legislative, administrative, or other body reprimanding a person, normally one of its own members, for specified conduct." Black's Law Dictionary 203 (5th ed. 1979). Per Robert's Rules, conduct subject to disciplinary action such as reprimand may be divided into two categories: (1) offenses committed during a meeting and (2) offenses committed by members outside a meeting.

Determining whether the Prudential Committee possessed the authority to censure LaFlamme, the trial court ruled:

> You've heard that there was a question as to whether [the Prudential Committee] had the legal right to censure the plaintiff. The court has determined that it did not have the authority to censure the plaintiff for conduct which occurred outside of committee meetings. It did have the right to censure the plaintiff for words and conduct which occurred during committee meetings.

We need not decide whether the court was correct in this ruling. As discussed below, defendants were entitled to judgment in their favor on the due process claim because LaFlamme failed to establish the requisite elements of a procedural due process violation.

■ To maintain a procedural due process action against a governmental entity, a plaintiff must show that he was deprived of interests protected by the Fourteenth Amendment. See *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 569 (1972). "[T]o determine whether due process requirements apply in the first place, we must look . . . to the *nature* of the interest at stake. We must look to see if the interest is within the Fourteenth Amendment's protection of liberty and property." *Id.* at 570-71 (citation omitted); accord *Brennan v. Town of Colchester*, 169 Vt. 175, 179, 730 A.2d 601, 605 (1999) (considering as initial step nature of claimed interest to determine if it is within scope of Fourteenth Amendment's protection of liberty and property).

The "stigma" that may result from a defamatory disciplinary action does not by itself implicate a "liberty" or "property" interest protected by the Due Process Clause. See *Paul v. Davis*, 424 U.S. 693,

701-12 (1976) (appearance of plaintiff's name and photograph on flyer captioned "Active Shoplifters" and distributed among merchants did not deprive plaintiff of any liberty or property rights); *Levinsky v. Diamond*, 151 Vt. 178, 196, 559 A.2d 1073, 1085 (1989) ("[M]ore than . . . [stigma] must be shown before a cognizable § 1983 claim arises."), *overruled in part on other grounds by Muzzy v. State*, 155 Vt. 279, 583 A.2d 82 (1990). Rather, for such stigma to invoke the procedural protections of due process under the Fourteenth Amendment, the governmental action must also deprive, extinguish, or significantly alter a right or status previously recognized and protected by law. See *Paul*, 424 U.S. at 701-12; see also *Siegert v. Gilley*, 500 U.S. 226, 233-34 (1991) (recognizing "stigma plus" test articulated in *Paul*); *Greenwood v. New York*, 163 F.3d 119, 124 (2d Cir. 1998) (same).

 Public censure or reprimand does not give rise to a procedural due process claim so long as injury is solely to a plaintiff's reputation. See *Siegert*, 500 U.S. at 234. To illustrate, compare the formal reprimand or discipline of a licensed professional, which may implicate due process because of the property interest in the license to practice the profession. The license to practice law, for example, is a property interest, infringement of which requires due process. See *In re Ellis*, 680 N.E.2d 1154, 1160 (Mass. 1997) ("A lawyer has a constitutionally protected property interest in his or her license to practice law, and is entitled to due process before any deprivation of that interest.") (citing *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976); *In re Ruffalo*, 390 U.S. 544, 550 (1968)).

The same may be said of the license to practice other professions or trades, depending on the legal status of the position or licensure. See *Barry v. Barchi*, 443 U.S. 55, 64 (1979) (based on New York law, horse trainer held property interest in license); *Sabow v. United States*, 93 F.3d 1445, 1456 (9th Cir. 1996) (medical license considered property interest); *Newman v. Burgin*, 930 F.2d 955, 959 (1st Cir. 1991) (state university's decision to publicly censure tenured professor and bar from administrative positions for five-year period treated as deprivation of liberty or property); *In re Smith*, 169 Vt. 162, 171-72, 703 A.2d 605, 612 (1999) (statutory procedures and nurse's substantial interest in maintaining her license — "her livelihood" — afforded nurse due process protections).

Nowhere in the evidence is it demonstrated how the Prudential Committee's public censure, regardless of its legality, damaged more than LaFlamme's reputation and deprived him of a "liberty" or

"property" interest. In response to defendants' appeal, LaFlamme argues that the committee's action affected his performance as a committee member, interfered with his freedoms of speech and association, and prevented his successful pursuit of a position as a village trustee. The evidence, however, does not support the necessary deprivation, extinguishment, or significant alteration of recognized right or status to allow a finding that the Prudential Committee violated LaFlamme's due process rights.

## I. Liberty Interest

LaFlamme argues that, "where the actions of a governmental authority are a deliberate effort to punish and interfere with the exercise of free expression or free association . . . an action lies [under] 42 U.S.C. § 1983." Certainly, an infringement of First Amendment rights involves one's liberty. Even though "[d]amage to reputation alone . . . does not implicate a liberty interest," when coupled with a deprivation of a First Amendment right, it may rise to the level of a due process violation. See *Silano v. Sag Harbor Union Free School Dist. Bd. of Educ.*, 42 F.3d 719, 724 (2d Cir. 1994). There are two factors in this case, however, that are fatal to LaFlamme's assertions as well as to the verdict in his favor.

First, with regard to the infringement of his free speech, LaFlamme presented that issue to the jury and lost. He cannot prevail on a due process claim by way of a violation of his right to free speech if the jury found that no such violation in fact occurred. Several courts have similarly dealt with a plaintiff's procedural due process claim brought in conjunction with a First Amendment claim, and, for lack of a First Amendment violation in the first instance, have held that the plaintiff did not suffer a denial of due process. See *id.* (school board's censure of fellow member for presentation to tenth-grade students did not violate First Amendment or procedural due process); *Peloza v. Capistrano Unified School Dist.*, 37 F.3d 517, 522-23 (9th Cir. 1994) (high school biology teacher's free speech and procedural due process claims based on school district's requirement that he teach evolutionism and order barring him from discussing his religious beliefs with students were properly dismissed); *Townshend v. Hazelroth*, 875 F. Supp. 1293, 1300-02 (E.D. Mich. 1995) (where plaintiff argued that defendants deprived him of liberty interest by retaliating against his exercise of free speech by filing ethics complaint and making defamatory statements, court held that plaintiff "failed to provide the court with any authority that actions of

defamation constitute a constitutional violation of First Amendment rights"); *Meyer v. University of Wash.*, 719 P.2d 98, 103 (Wash. 1986) (en banc) (holding that tenured professor's due process claim, where, after being reprimanded, he argued that "his liberty interest was affected because his reputation was damaged, coupled with a violation of his . . . right to free speech," was properly dismissed in part because his First Amendment rights were not violated).

Second, particularly with regard to the right of free association, the evidence does not support a finding that the censure deprived LaFlamme of this right or otherwise significantly altered this liberty. The Supreme Court clearly stated in *Paul* that the "weight of [its] decisions establishes no constitutional doctrine converting every defamation by a public official into a deprivation of liberty." *Paul*, 424 U.S. at 702. Instead, it is only those defamations, reprimands, or disciplinary acts that also effectuate a deprivation, extinguishment, or significant alteration of a liberty or property interest which become actionable under the Due Process Clause. In reviewing those cases in which the Court has found a violation of procedural due process, the Court noted that liberty or property interests had been "deprived," "den[ied]," "remov[ed]," and "distinctly altered or extinguished." *Id.* at 708-11. In other words, we believe that more than a mere interference with one's association with others — the core injury wrought by defamation — is required to support a finding of denial of due process. As we stated in *Levinsky*, the argument that there need not be actual deprivation in order to find a § 1983 violation "ignores the language of the enabling statute, which mandates liability for the 'deprivation of any rights, privileges, or immunities secured by the Constitution and laws.'" *Levinsky*, 151 Vt. at 196, 559 A.2d at 1085 (quoting 42 U.S.C. § 1983).

█ The censure's adverse effect on LaFlamme's associations and ability to perform as a member of the Prudential Committee did not amount to a deprivation of his right of free association. The committee did not, in concert with censure, bar LaFlamme from associating with others or otherwise impose restrictions upon his ability to associate. The censure no doubt adversely affected his reputation, but, as discussed above, such "stigma" is not enough to qualify as denying or distinctly altering his freedom to associate. Despite LaFlamme's assertion that "the jury found . . . that the censure seriously impaired the exercise of his office," the record does not illustrate a violation of his right to freely associate. Therefore, the evidence

simply does not support a finding of a deprivation of a liberty interest sufficient to sustain the verdict.

## II. Property Interest

The evidence similarly fails to show that LaFlamme was deprived of a property interest. "Property interests are not created by the Constitution, 'they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law . . . .'" *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985) (quoting *Roth*, 408 U.S. at 577); accord *Burroughs v. West Windsor Bd. of School Dirs.*, 138 Vt. 575, 578, 420 A.2d 861, 863 (1980) ("Whether [a] right is a property interest depends upon state law."). In Vermont, for example, the collective-bargaining agreement provides state employees with a property interest in their employment, thus affording due process protections if they face the prospect of discharge. See *In re Towle*, 164 Vt. 145, 153, 665 A.2d 55, 61 (1995).

In this case, there exist two possible hooks upon which a property interest might hang: membership in the Prudential Committee and the resulting potential afforded to gain future political office. Neither, however, constitutes a property interest.

Assuming without deciding that Vermont law vests school board members with a property interest in that membership, LaFlamme's voluntary resignation from the position did not in turn impute to the committee the act of depriving him of a property interest. LaFlamme retained his position on the Prudential Committee for approximately one year following the censure. The committee did not remove him from office. As the Court noted in *Paul*, it "has never held that the mere defamation of an individual . . . was sufficient to invoke the guarantees of procedural due process absent an accompanying loss of government employment." *Paul*, 424 U.S. at 706.

LaFlamme also held no cognizable property interest in the possibility of being elected village trustee. "A property interest arises when a person has a 'legitimate claim of entitlement' to a governmental benefit, rather than a 'unilateral expectation.'" *Brennan*, 169 Vt. at 179, 730 A.2d at 605 (quoting *Roth*, 408 U.S. at 577). Even if the censure did impair his pursuit of this position, such an effect does not amount to a deprivation of a property interest. LaFlamme's unilateral hope of becoming a village trustee was by no means an entitlement to the position.

Because the Prudential Committee's public censure did not deny or significantly alter a liberty or property interest, defendants were entitled to judgment as a matter of law on the procedural due process claim.

*Reversed.*