Thomas **WILKINSON** and Benjamin Wilkinson, by and through his father and guardian, Thomas Wilkinson, Plaintiffs,

v.

Stephen J. **BALSAM**, M.D., Carolyn S. Russell and James Adams, Defendants.

No. 2:94–CV–175.

United States District Court, D. Vermont.

April 17, 1995.

Harold B. Stevens, III, Stowe, VT, for plaintiffs.

Ritchie E. Berger, Shapleigh Smith, Jr., Dinse, Erdmann & Clapp, Burlington, VT, for defendant Stephen Balsam, M.D.

Harrison B. Lebowitz, Jeffrey L. Amestoy, Atty. Gen., VT Atty. Gen. Office, Montpelier, VT, for defendants Carolyn S. Russell and James Adams.

## OPINION AND ORDER

PARKER, Chief Judge.

Thomas Wilkinson claims that he was falsely accused of sexually abusing his young son, Benjamin Wilkinson (Ben), and stepson, Jonathan Wiegand. He brought this action in state court on his own and Ben's behalf, against Stephen J. Balsam, M.D., a psychiatrist who treated Ben, Jonathan and their mother, Linda Wiegand, and against two employees of the Vermont Department of Social and Rehabilitation Services (SRS), Carolyn S. Russell and James Adams. The case was removed to this court on the ground that the complaint contains a federal civil rights claim in addition to several state tort claims.

Specifically, the complaint is predicated on the following legal theories, against individual defendants as stated: (1) slander, against Balsam; (2) negligence in the evaluation and diagnosis of Ben, against Balsam; (3) malpractice in the treatment of Ben, against Balsam; (4) "family malpractice," against Balsam; (5) deprivation of civil rights, against Adams; (6) "ultra vires substantiation," against Russell; (7) conspiracy, against all three defendants; and (8) infliction of emotional distress, against all defendants.

Several motions are now pending, most notably motions for summary judgment filed by the defendants. To analyze the motions for summary judgment, it is necessary to review in detail the facts adduced by the plaintiffs.

### FACTS

The following facts are either not in dispute or, if they are in dispute, are supported by the affidavits and accompanying evidentiary material submitted by the plaintiffs, as required by Fed.R.Civ.P. 56(e).

After a separation of a few months, Wilkinson commenced a divorce proceeding against Wiegand in Connecticut in September 1992, seeking joint custody of their child Ben, who was born on January 8, 1989. Wiegand opposed joint custody and sought sole custody of Ben. Wiegand subsequently moved to Stowe, Vermont, with Ben and her son from a prior marriage, Jonathan, born January 3, 1986. Jonathan had a history of emotional difficulty. Throughout 1992, Wilkinson exercised regular visitation with the two children.

In late 1992, Wiegand was referred by her physician, Gordon Ahlers, to Dr. Balsam, a licensed psychiatrist then practicing in Burlington. During her second visit with Balsam, she discussed concerns about her children acting out sexually, specifically mentioning her concern that Wilkinson might have sexually abused them. Balsam saw the children first on January 6, 1993 and concluded after the one session that Wilkinson had sexually abused the boys, perhaps in the context of devil worship.

Balsam met with the boys again on January 14, when they showed him drawings depicting sexual contact between Wilkinson and Ben, including anal and oral intercourse. There was no physical evidence for such abuse: Dr. Ahlers examined the children on January 14 and found no signs of abuse. After seeing the boys, Balsam told Wiegand that Ben had been sexually abused by his father and urged her to report the abuse to SRS. Balsam also related his conclusions to Dr. Ahlers. At about this time, Wiegand's mother, Carol Morrisey, spoke to Balsam and told him it was her belief that *Wiegand* might be sexually abusing the two children.

He told her not to report her suspicion to SRS.

On January 18 or 19, 1993, Wiegand reported to SRS that Wilkinson had abused Ben. Balsam too called SRS and confirmed the report, stating that he was certain of its truth. He indicated that Wilkinson may have abused Jonathan as well, but did not mention Morrisey's belief that Wiegand herself may have abused the children. SRS assigned the matter to defendant Adams, a social worker at SRS's Morrisville office, for investigation.

On January 21, Adams and Stowe police officer Bruce Merriam interviewed Wiegand, Ben and Jonathan. A transcript of the taped interview with Ben has been filed with the court. During the interview Ben, just 4 years old, says that his father committed various sexual acts upon him, but he also says that he made things up and that his mother made him say things. For example, after Ben affirmatively answers Adams's query whether "daddy put his penis in your mouth," Ben says "I made it up." Adams asks, "You made it up?" Answer: "Yeah. She makes me say it. I did it for mom." Transcript at 11. At another point, Ben, showing a picture he drew, says "Dad put his tongue in my butt." He then says "Someone told me to make it up." Transcript at 18. The interviewers frequently ask leading questions and suggest the answers they wish to hear. For example, after Ben is asked whether his father put his penis in Ben's "butt," Ben's response is at first unclear. Adams pursues, "Did he ever do that, yes or no?" Again, Ben's answer is unclear. Adams: "Did someone tell you to say that or did it really happen?" Ben: "It really happened." Adams responds: "It really happened. Okay. *That's what we need to know.*" Transcript at 20–21 (emphasis added). Later, Adams asks whether Ben "like[s] to sing Devil songs with Daddy." Ben says "Uh-huh." Transcript at 24.

Upon concluding these interviews, SRS substantiated the report of abuse against Wilkinson.[1] On the same day, Detective Merriam contacted Balsam, who confirmed his views of the matter, including his belief that the abuse occurred as part of a devil worship ritual. Merriam swore out an affidavit of probable cause, and on January 25, Wilkinson was arrested and charged with sexually abusing his son. He denies the charges. He pled not guilty and was released on bail with the condition that he have no contact with Ben.

On January 27, 1993, Adams was informed that Wiegand's nephew had complained to his father, Craig Martin, that Wiegand had sexually abused him. Adams shared this information with Balsam, but not with Wilkinson. During this period, and for about six months thereafter, Balsam continued to treat the two boys as victims of sexual abuse perpetrated by Wilkinson.

On February 9, 1993, Adams and his supervisor, Gerald Jeffords, notified Wilkinson in writing that SRS had substantiated the report of child abuse involving Ben. Prior to this time, no one at SRS had contacted or notified Wilkinson about the investigation. Wilkinson thereupon began the appeal process to the Human Services Board, explaining that he believed Wiegand had coached her sons to make the allegations of sexual abuse in retaliation for his seeking joint custody of Ben. He reported his belief that such coaching placed the children in substantial risk of harm and asked SRS to investigate. Jeffords responded by letter on February 25, stating: "I have decided to not accept your letter as a report of abuse or neglect. This situation has already been investigated and the case is closed." Wilkinson attended an informal hearing on March 14 with Adams, Jeffords and Russell, the SRS District Director in Morrisville. By letter the following week, Russell explained that after reviewing the record, including documents submitted by Wilkinson, and after speaking with Balsam, she had determined to uphold the substantiation decision.

---

1. " 'Substantiated report' means that the commissioner [of SRS] or the commissioner's designee has determined after investigation that a report is based upon accurate and reliable information that would lead a reasonable person to believe that the child has been abused or neglected." 33 V.S.A. § 4912(10).

On May 3, 1993, Wilkinson and SRS entered into a written consent agreement to stay the appeal to the Human Services Board pending the outcome of the criminal and divorce litigation. The agreement provided further: "In the interim, SRS will remove Thomas Wilkinson's name from its registry as well as its substantiation of sexual abuse against him." On May 12, Adams informed Wilkinson that SRS had initiated an investigation of allegations that Wilkinson had abused Jonathan, noting that this matter too was "on hold" and that SRS would "stay" a decision to substantiate the abuse of Jonathan.

At about this time, the Connecticut family court appointed Wilkinson's sister, Karen Wilkinson, as Ben's guardian. Wiegand disappeared with the children.

On July 15, 1993, notwithstanding the consent agreement, Russell wrote to the Connecticut Department of Children and Families. She stated that SRS "made a substantiation of sexual abuse perpetrated on Ben by Thomas Wilkinson" and "made a determination that sexual abuse was perpetrated on Jon by Tom Wilkinson," and provided details of the allegations. She opined that "[i]f either of the boys were to be ordered in [Karen Wilkinson's] custody this could place them at great risk of harm and further abuse by Mr. Wilkinson."

In July 1993, the State of Vermont withdrew the criminal complaint against Wilkinson, because of insufficient evidence and indications that Wiegand had lied about other matters.

The Connecticut family court appointed Dr. Kenneth Robson to evaluate the family; he met with Wilkinson, Wiegand (who had reappeared), both children, and Karen Wilkinson, and spoke with Balsam and Lee Dow, Esq., the assistant state's attorney in the criminal case. He also reviewed the transcripts of Adams's interviews with the children, medical and psychological records, the children's drawings, depositions from the criminal case, and other written material. Robson completed his report in December 1993. It contains a severe critique of the methods used by Balsam and SRS, and contradicts their conclusions, finding the allega-

tions of sexual abuse by Wilkinson to be "highly unlikely." Robson Report at 86.

After the report was filed with the Connecticut family court, the court revisited the custody issue and awarded Wilkinson custody and guardianship of both children. Wiegand again disappeared with the children. Attempts to locate them have failed.

Because Dr. Robson's observations are vital to the plaintiffs' case and to resolving the summary judgment motions, they are discussed here in some detail.

Robson notes the conflicting roles performed by Dr. Balsam: "As is appropriate for a *therapist,* he developed a strong and positive relationship and position of advocacy for Ms. Wiegand from the beginning. As her therapist and that of the boys, it would be virtually impossible and clinically inadvisable for him to *simultaneously* conduct an impartial *evaluation* of allegations of sexual abuse." *Id.* at 15 (emphasis in original). Robson notes further:

> Not only was this differentiation not made by Dr. Balsam, but he went forward with the treatment of both boys with the conviction that sexual abuse had occurred. He reached that conviction early in his contacts with the boys and seems not to have utilized a substantial amount of information that is always essential in assessing the credibility of such allegations. Such information would include detailed family histories of both parents, marital histories, developmental histories of both boys, psychiatric histories of both parents and their families, current practices within the home that would expose the children to overstimulation or explicit sexual materials, and observations of both children with the alleging parent and unless absolutely contraindicated, the alleged perpetrator.... [T]he *context* of these allegations and their *timing* in relation to an intensifying custody dispute should alert any clinician as to cautious assessment of these allegations.

*Id.* at 15–16 (emphasis in original). Robson opines that Balsam "reached a definitive conviction that these allegations were true after only brief clinical contact that *disregarded the usual standards* by which such complex

allegations are evaluated and in the absence of much supporting data which could have been available to him." *Id.* at 20 (emphasis added). He states further:

> Not only did [Balsam] fail to differentiate the evaluative versus the therapeutic roles, but his evaluation was *technically flawed in serious ways.* Linda Wiegand was already his patient and by extension the children as well; his advocacy was on their behalf even though he made every effort to be evenhanded. It does not appear that he gathered significant background information on either parent including a history of the marital relationship and the custody conflict that was at the center of it as it began to dissolve. He did not conduct interviews that systemically observed the interaction between Linda Wiegand and each of the children alone and together with her which would have been revelatory of the kinds of data I observed several months later. The exclusion of the alleged perpetrator from the evaluation was absolute and kept Dr. Balsam from access to clinical observations that might have altered his point of view regarding the credibility of the allegations.

*Id.* at 80–81 (emphasis added).

In his report Dr. Robson also assesses Adams's and Merriam's interview with the boys on January 21, 1993. That interview begins with a "definite bias." *Id.* at 20. Robson notes Ben's recantations and the indications of maternal coaching in the interview ("I made it up," "she makes me say it," and other examples) and opines: "It seems to me *extremely important* that he [Adams] does not follow-up this recantation or inquire about it at that time." *Id.* at 21 (emphasis in original). Robson states his "impression that there is an increasing need on the interviewer's part to document the allegations despite the confusion and nonconfirmatory information being provided to him." *Id.* at 22. Robson discusses other infirmities, such as Adams's improper, leading use of anatomically correct dolls. *Id.* at 23. Robson concludes:

> This interview is particularly worrisome to me. It appears biased from the beginning. There are numerous examples of leading throughout its content. There are spontaneous communications from Benjamin that at least seriously raise the question of coaching on his mother's part that are neglected by the interviewer. And there is confusing information that is far from explicit when the interviewer attempts to document a particular time, place, and interaction.

*Id.* at 23–24. And later in the report:

> The interview of both boys by James Adams and Officer Merriam was seriously flawed. There are numerous episodes of leading in these interviews. The boys' uncertainty as to the allegations, and their allusions to maternal influence are *ignored* by the interviewer. There is little or no effort to establish a relationship with either child prior to actively discussing the allegations of abuse. My impression is of a presumption on the part of the interviewers that abuse had occurred and ignoring of other cues and sources of information that might contribute to a more neutral and objective clinical assessment.

*Id.* at 81 (emphasis in original).

Robson also notes that "Ms. Wiegand's eagerness and enthusiasm to gather information whether it was pictures, documents, teddy bears, etc. throughout the process of the allegations is more compatible with the behavior of adults in situations involving false allegations of sexual abuse." *Id.* at 83.

Robson considers aspects of the children's allegations themselves which bear on credibility, noting that they lack specificity as to time, place and setting, and have a "canned" quality, that they "became preposterous and impossible" (e.g., Jonathan, lying in his upper bunk, seeing Wilkinson's penis "in Ben's butt"), and that Jonathan showed uncertainty and confusion following Ben's recantations, among other indications of incredibility. *Id.* at 83–85. Further, "[t]he fact that there were normal physical findings in the examination performed by Dr. Ahlers, despite allegations of repeated anal penetration, is more supportive of the lack of credibility of these allegations." *Id.* at 85–86.

Plaintiffs have also submitted affidavits by Douglas Dennett, M.D., and Roger Kessler.

Dr. Dennett, an expert in child psychiatry, having reviewed much of the written evidence, opines that both Balsam and Adams were grossly negligent in a number of respects in this case and that they, along with Russell and Jeffords, had no "objective, reasonable basis to continue their substantiation of the abuse." Kessler, a psychologist who knows and has worked with Adams, Russell and Jeffords at the Morrisville SRS office, opines that those individuals were aware of a parent's constitutionally protected interest in the companionship of their children.

Plaintiffs also allege, although this point does not appear to be supported by evidence, that Balsam, Adams and Russell aided and abetted Wiegand in secreting herself and the children.

## DISCUSSION OF PENDING MOTIONS

### 1. *Plaintiffs' Motion to Join Parties and Amend Complaint*

This motion was filed on July 26, 1994, approximately one and a half months after filing of the initial complaint, and prior to any discovery (which is presently stayed pending disposition of the instant motions). The motion seeks to join Jonathan Wiegand as a plaintiff and Linda Wiegand, SRS and Gerald Jeffords as defendants, pursuant to Fed. R.Civ.P. 20(a) (permissive joinder), and to amend and add to the counts and factual allegations in the complaint, pursuant to Rule 15(a). The claims continue to focus on the same incidents as set forth in the initial complaint.

The following counts are pled in the amended complaint, against defendants as specified: (1) libel and slander, against all defendants; (2) negligence, against all defendants except Wiegand; (3) malpractice in connection with treatment of Ben and Jonathan, against Balsam; (4) "family malpractice," against Balsam; (5) deprivation of civil rights in violation of 42 U.S.C. § 1983, against Adams; (6) denial of due process in violation of 42 U.S.C. § 1983, against Adams, Jeffords, Russell and SRS; (7) conspiracy in violation of 42 U.S.C. § 1983, against all defendants; (8) infliction of emotional distress, against all defendants; and (9) negligence per se (failure to follow statutory law on reporting and investigating abuse), against all defendants except Wiegand.

The defendants oppose the motion, asserting that it is made in bad faith and is futile because the proposed amendments cannot survive summary judgment. The latter claim is premised on the defendants' contention that the present, unamended complaint cannot survive summary judgment, largely on the basis of defendants' asserted immunity defenses, and that the proposed amendments do not alter this fact. For reasons set forth below, however, the court today denies defendants' motions for summary judgment. The proposed amendments do not appear to be futile. Further, there is no evidence of bad faith on plaintiffs' part.

Accordingly, plaintiffs' motion to join parties and to amend their complaint (paper # 38 in the court's file) is GRANTED.

### 2. *Motion for More Definite Statement*

Russell and Adams filed this motion to seek clarification with respect to Count VIII, entitled "Infliction of Emotional Distress." As pled initially, the count does not make clear whether plaintiffs are seeking to recover for intentional or negligent infliction of emotional distress, two different theories. In their opposition to the motion, however, plaintiffs make it plain that Count VIII is for intentional infliction of emotional distress, and Adams and Russell have since filed a supplemental answer responding to the allegations in Count VIII.

The motion (paper # 25) is accordingly DENIED as moot.

### 3. *Balsam's Motion for Summary Judgment*

Summary judgment may be granted only where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). In considering the motion, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there

is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. at 2513.

Balsam moves for summary judgment on all claims against him raised by Wilkinson (Counts I, II, III, IV, VII and VIII of the initial complaint) and for partial summary judgment as to the conspiracy and intentional infliction of emotional distress claims (Counts VII and VIII) made against him by Ben. He raises several distinct issues, discussed below in turn.

### a. *Statutory Immunity*

Vermont law requires a physician who reasonably suspects child abuse to report to SRS. 33 V.S.A. § 4913(a) provides:

> Any physician ... who has reasonable cause to believe that any child has been abused or neglected shall report or cause a report to be made in accordance with the provisions of section 4914 of this title [providing that such report is to be made to SRS] within 24 hours.

One who files a report in accordance with this provision is entitled to good faith immunity:

> Any person enumerated in subsections (a) or (b) of this section, other than a person suspected of child abuse, who in good faith makes a report to the department of social and rehabilitation services shall be immune from any civil or criminal liability which might otherwise be incurred or imposed as a result of making a report.

33 V.S.A. § 4913(c).

Balsam contends that he is immune, by virtue of § 4913, from any liability he might otherwise have incurred as a result of his having filed, or caused to have filed, a report of abuse with SRS.

■ Plaintiffs respond to this contention by arguing, first, that the immunity of § 4913(c) covers only a person who has made a report within 24 hours of suspecting abuse, and that Balsam waited more than 24 hours before reporting. This argument is unper-suasive. The statute indeed requires reports to be made within 24 hours, but the immunity provision is not limited to those who *timely* report. To the contrary, § 4913(c) gives immunity to *any person* enumerated in the preceding sections (such as a physician) who in good faith makes a report to SRS.

■ More problematic for Balsam, however, is the limitation of the grant of immunity to those who report "in good faith." A genuine issue of fact exists as to whether Balsam acted in good faith in reporting his beliefs, and continuing to validate the allegations after the initial report. For example, Wiegand's mother, Carol Morrisey, stated in her deposition that when she learned Wiegand had taken the boys to see Dr. Balsam, she called him on January 19, 1993 to discuss her concerns that Wiegand herself may be abusing or neglecting the children. She told Balsam that she intended to call SRS with this information. Balsam urged her not to call SRS, as it would "hurt" Wiegand's case. Given Balsam's involvement in the matter as Wiegand's therapist and, perhaps, advocate, the evidence provided by Morrisey (credited as true, for purposes of the summary judgment motion) suggests that Balsam was deceitful—in short, that his actions were undertaken without good faith.

■ Further, the statute grants good faith immunity only with respect to liability incurred "as a result of making a report." Balsam's actions in this case were not limited to making a report. He rendered a diagnosis that Ben is a victim of his father's sexual abuse, and offered his opinions to Wiegand, the Stowe police and others. There is evidence that his diagnosis is the result of gross negligence. To the extent the plaintiffs' damages flow from the flawed diagnosis, independent of the SRS report, Balsam cannot benefit from the immunity granted by § 4913(c).

### b. *Privilege*

■ Balsam argues that any statements he made to Stowe police officers in the course of their criminal investigation are protected by an absolute privilege, thereby defeating the slander count (as well as the

conspiracy and emotional distress counts to the extent they are predicated on statements to the police).

■ Although it does not appear that Vermont courts have spoken on this question, there is authority for Balsam's claim of privilege. *See* Restatement (Second) of Torts § 588 (1977) (witness absolutely privileged to publish defamatory matter "in communications preliminary to a proposed judicial proceeding"); *Frazier v. Bailey,* 957 F.2d 920, 932 (1st Cir.1992). It seems likely the Vermont Supreme Court, if faced with the issue, would adopt the Restatement principle. *See Crump v. P & C Food Markets, Inc.,* 154 Vt. 284, 292, 576 A.2d 441 (1990) (following Restatement in related context). Balsam's statements to Merriam, once a criminal investigation had commenced, arguably fit within the privilege.

Nevertheless, the privilege is of little avail to Balsam. Detective Merriam had participated in the interviews with the boys and Wiegand prior to his telephone conversation with Balsam. Thus, the criminal investigation (and the consequent injury to Wilkinson) ensued at least in part because of Balsam's report to SRS, not only because of his direct communications with Merriam. More broadly, the defamation and related counts are not limited to harm caused by Balsam's statements to police officers; Balsam spoke to other individuals as well.

### c. Duty to Wilkinson

■ Balsam next contends that, as he treated only Ben, Jonathan, and Wiegand, he owed no duty as a matter of law to *Wilkinson,* who was never his patient, and therefore he is entitled to summary judgment as to the claims of professional negligence and malpractice (Counts II, III and IV) brought by Wilkinson.

"The first prerequisite in any negligence proceeding must be to establish the existence of a legally cognizable duty." *Smith v. Day,* 148 Vt. 595, 597, 538 A.2d 157 (1987). "'Duty' may be viewed as 'an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection.'" *Denis Bail Bonds, Inc. v. State of Vermont,* 159 Vt. 481, 487, 622 A.2d 495 (1993) (quoting W. Prosser & W. Keeton, The Law of Torts § 53, at 358 (5th ed. 1984)).

■ Balsam asserts that the mental health professional's duty is owed only to the patient. This is certainly not always the case. For example, in *Peck v. Counseling Service of Addison County, Inc.,* 146 Vt. 61, 65, 499 A.2d 422 (1985), the Vermont Supreme Court recognized that under certain circumstances a therapist owes a duty of care to potential victims of the therapist's patient. "Once a therapist determines, or, based on the standards of the mental health professional community, should have determined that his or her patient poses a serious risk of danger to another, then he or she has the duty to take whatever steps are reasonably necessary to protect the *foreseeable victim* of that danger." *Id.* at 66–67, 499 A.2d 422 (emphasis added).

Foreseeability is central to the analysis. "'The existence of a duty is primarily a question of law, and dependent upon a variety of relevant factors, of which foreseeability of the risk is a primary consideration....'" *Langle v. Kurkul,* 146 Vt. 513, 519, 510 A.2d 1301 (1986) (quoting *Coulter v. Superior Court,* 21 Cal.3d 144, 152, 577 P.2d 669, 674, 145 Cal.Rptr. 534, 539 (1978) (internal quotation omitted)). For example, in *Smith v. Day,* the Vermont Supreme Court held that a university owed no duty of care to third persons harmed by the criminal acts of the university's students, noting that the university "had absolutely no reasonably foreseeable notice" of the student's acts. 148 Vt. at 598, 538 A.2d 157.

In this case, the issue is not harm to a third party perpetrated by a patient of the psychiatrist, but harm to the third party arising *directly* from the psychiatrist's negligent evaluation and treatment of his patient. But the analysis proceeds as in *Peck, Langle* and *Smith.* The question remains whether there are sufficient facts in evidence in the particular case to warrant the conclusion that the psychiatrist's conduct will foreseeably harm the third party; if so, the psychiatrist owes a duty of care to the third party.

Here, plaintiffs have adduced sufficient facts to create a genuine issue as to whether Balsam ought reasonably to have foreseen that his negligent evaluation, diagnosis, and treatment of Ben and Jonathan, and his decisions to report his own conclusions but to dissuade Morrisey from reporting hers, would cause injury to Wilkinson. If the factfinder determines that harm to Wilkinson was foreseeable in the circumstances, then Balsam owed a legal duty to Wilkinson to conform his conduct to the appropriate standard of care. Balsam is not entitled to summary judgment on the issue.

#### d. *Intentional Infliction of Emotional Distress*

■ To prove the tort of intentional infliction of emotional distress in Vermont, the plaintiff must demonstrate "outrageous conduct, done intentionally or with reckless disregard of the probability of causing emotional distress, resulting in the suffering of extreme emotional distress, actually or proximately caused by the outrageous conduct." *Crump v. P & C Food Markets, Inc.*, 154 Vt. at 296, 576 A.2d 441 (internal quotations omitted).

Disputed facts exist as to each of the elements of this tort. If plaintiffs' evidence is credited, Dr. Balsam reached and reported a false conclusion that Wilkinson had sexually abused Ben—had subjected Ben to anal and oral intercourse during satanic ritual—on flimsy evidence and in a grossly negligent manner, ignoring his own conflict of interest as Wiegand's therapist and advocate, knowing that his verdict would probably occasion a criminal prosecution of Wilkinson, the most profound abhorrence among his fellows, and the forced alienation of his son. And he continued to validate the claims of abuse and continued to treat the children as victims of Wilkinson's depredations even in the face of evident maternal coaching and Wiegand's nephew's complaint that *Wiegand* had sexually abused him. The court has little difficulty in concluding that such conduct is "outrageous." And it should go without saying that in our culture these charges cause deep pain and humiliation—extreme emotional distress.

Balsam's motion for summary judgment (paper # 5) is accordingly DENIED.

#### 4. *Russell's and Adams's Motion for Summary Judgment*

Russell and Adams also move for summary judgment, but on different issues than those raised in Balsam's motion. As employees of a state agency acting within the scope of their employment, Russell and Adams contend they are immune from suit under the doctrine of qualified official immunity. The scope of this doctrine depends on whether a claim arises under federal or state law, and hence the federal and state claims are discussed separately below. Russell and Adams also argue that Counts VI ("ultra vires substantiation") and VII ("conspiracy") fail to state causes of action under state law.

As to the latter point, in their amended complaint plaintiffs have recast Counts VI (now denominated "denial of due process") and VII to make clear that both are intended to state federal causes of action under 42 U.S.C. § 1983. Defendants' request to dismiss these counts for failure to state causes of action under state law is accordingly denied.

#### a. *Federal Qualified Immunity*

"Qualified immunity strikes a balance between compensating those who have been injured by official conduct and protecting government's ability to perform its traditional functions." *Wyatt v. Cole*, 504 U.S. 158, 167–68, 112 S.Ct. 1827, 1833, 118 L.Ed.2d 504 (1992). The doctrine is now well established "that government officials performing discretionary functions are shielded from 'liability for civil damages insofar as their conduct [did] not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.*, 504 U.S. at 166, 112 S.Ct. at 1832 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)).

In a recent decision, the Second Circuit Court of Appeals reviewed the doctrine as follows:

Whether a defendant actually violated a plaintiff's rights is not the central issue: "Even defendants who violate constitution-

al rights enjoy a qualified immunity that protects them from liability for damages unless it is further demonstrated that their conduct was unreasonable under the applicable standard." *Davis v. Scherer,* 468 U.S. 183, 190, [104 S.Ct. 3012, 3017, 82 L.Ed.2d 139] (1984); *see also Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir. 1991) ("[Q]ualified immunity is generally considered separate and apart from the merits of the case, even though plaintiff's factual allegations must be examined ... in resolving the immunity issue."); *Collins v. Marina–Martinez,* 894 F.2d 474, 478 (1st Cir.1990) ("Because qualified immunity does not address the substantive viability of a section 1983 claim, but rather the objective reasonableness of a defendant's actions, a plaintiff who is entitled to prevail on the merits is not necessarily entitled to prevail on the issue of qualified immunity."). "Essentially, if it is objectively reasonable for an official to believe that he or she is acting within constitutional and statutory bounds, the official will be insulated from liability stemming from his or her conduct." *Natale v. Town of Ridgefield,* 927 F.2d 101, 104–05 (2d Cir.1991).

*Zahra v. Town of Southold,* 48 F.3d 674, 686 (2d Cir.1995).

■ Both the state of constitutional law at the time of the challenged conduct and the reasonableness of the official's belief as to the lawfulness of that conduct are relevant to the inquiry. "The defense of qualified immunity shields governmental officials from civil liability if the official's conduct did not violate constitutional rights that were clearly established at the pertinent time or if it was objectively reasonable for the official to believe that the conduct did not violate such rights." *Cecere v. City of New York,* 967 F.2d 826, 829 (2d Cir.1992); *accord van Emrik v. Chemung County Dept. of Social Services,* 911 F.2d 863, 865–66 (2d Cir.1990).

Moreover, the doctrine provides for immunity not just from liability but from *suit,* and is therefore often appropriate for disposition upon a motion for summary judgment. *See Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 2815–16, 86 L.Ed.2d 411 (1985). But this is not always the case. In *Zahra,*

for example, the immunity defense was "properly before the court at the close of the evidence." 48 F.3d at 687 n. 7. "When a qualified immunity is asserted in a motion for summary judgment ... the facts material to the claim of qualified immunity must not be genuinely disputed." *Cecere,* 967 F.2d at 829. The record prior to trial may simply be inadequate to determine whether an official can claim the protection of qualified immunity. *Hill v. City of New York,* 45 F.3d 653, 663 (2d Cir.1995). "To some extent the availability of qualified immunity turns on inquiries into specific facts." *Id.*

■ That is the case here. For the reasons set forth below, I am satisfied that the evidence submitted by the plaintiffs, *if proved,* is sufficient to support a finding that Russell and Adams violated the clearly established constitutional rights of the plaintiffs and that they did not have an objectively reasonable basis to believe that their conduct did not violate such rights.

In *Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 1394–95, 71 L.Ed.2d 599 (1982), the Supreme Court noted its "historical recognition that freedom of personal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment." Earlier, in *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 1212–13, 31 L.Ed.2d 551 (1972), the Court wrote:

The Court has frequently emphasized the importance of the family. The rights to conceive and to raise one's children have been deemed "essential," *Meyer v. Nebraska,* 262 U.S. 390, 399 [43 S.Ct. 625, 626–27, 67 L.Ed. 1042] (1923), "basic civil rights of man," *Skinner v. Oklahoma,* 316 U.S. 535, 541, [62 S.Ct. 1110, 1113, 86 L.Ed. 1655] (1942), and "[r]ights far more precious ... than property rights," *May v. Anderson,* 345 U.S. 528, 533, [73 S.Ct. 840, 843, 97 L.Ed. 1221] (1953).

Moreover, "[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents." *Santosky,* 455 U.S. at 753, 102 S.Ct. at 1395.

■ The right of family integrity is not absolute of course, nor are its dimensions sharply defined. Courts have emphasized "the amorphous nature of a liberty interest in familial relationships." *Frazier v. Bailey*, 957 F.2d at 931 (social workers entitled to qualified immunity where plaintiff failed to show that their actions in responding to allegations of sexual abuse violated right of family integrity; "the dimensions of this right have yet to be clearly established"); *see Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987) ("The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.").

■ However, not every interference with the right of family integrity is insulated from legal challenge merely because that right is amorphous and its outer dimensions have yet to be clearly established. Particular aspects of the broad right *are* clearly established. The state, for example, must prove by clear and convincing evidence that a parent is unfit before terminating parental rights. *Santosky*, 455 U.S. at 769, 102 S.Ct. at 1403. Moreover, parents are always constitutionally entitled to be free of the state's *arbitrary* interference in familial relationships. This is but an instance of a general principle of substantive due process under the Fourteenth Amendment. *See, e.g., Washington v. Harper*, 494 U.S. 210, 221–22, 110 S.Ct. 1028, 1036–37, 108 L.Ed.2d 178 (1990) (prison inmate with mental illness has liberty interest under due process clause in being free from arbitrary administration of antipsychotic drugs against his will); *Regents of University of Michigan v. Ewing*, 474 U.S. 214, 225, 106 S.Ct. 507, 513, 88 L.Ed.2d 523 (1985) (university did not violate substantive due process right of student who was dismissed from academic program where its actions were not arbitrary and record demonstrated that "the faculty's decision was made conscientiously and with careful deliberation, based on an evaluation of the entirety of [the student's] academic career"); *Youngberg v. Romeo*, 457 U.S. 307, 321, 102 S.Ct. 2452, 2461, 73 L.Ed.2d 28 (1982) (in reviewing challenge by involuntarily committed mentally retarded persons to their condi-

tions of confinement, substantive due process "requires that the courts make certain that professional judgment in fact was exercised"); *Parham v. J.R.*, 442 U.S. 584, 606–615, 99 S.Ct. 2493, 2506–2510, 61 L.Ed.2d 101 (1979) (state's procedure for institutionalizing children for mental health care upheld where decision represents independent judgment of what child requires and is not arbitrary); *Schware v. Board of Bar Examiners*, 353 U.S. 232, 239, 77 S.Ct. 752, 756, 1 L.Ed.2d 796 (1957) (under Fourteenth Amendment "officers of a State cannot exclude an applicant [to the bar] when there is no basis for their finding that he fails to meet [permissible] standards"). Under these precedents and principles, a state official's deprivation of a parent's right in the custody of his or her children, premised on fabricated or wholly unsubstantiated grounds, violates a clearly established constitutional right.

Russell and Adams rely heavily on the Second Circuit's decision in *van Emrik v. Chemung County Dept. of Social Services*. That case involved a suit against child protective services caseworkers who had caused a suspected child abuse victim to be temporarily removed from her parents' custody. 911 F.2d at 865. The court's discussion of the immunity defense is informative:

> Though a decision to remove a child from parental custody implicates the constitutional rights of the parents, it obliges protective services caseworkers to choose between difficult alternatives in the context of suspected child abuse. If they err in interrupting parental custody, they may be accused of infringing the parents' constitutional rights. If they err in not removing the child, they risk injury to the child and may be accused of infringing the child's rights. It is precisely the function of qualified immunity to protect state officials in choosing between such alternatives, *provided that there is an objectively reasonable basis for their decision*, whichever way they make it. Such a basis existed in this case. The defendants were confronted with an infant who had suffered a broken leg, characterized by an attending physician as "very suspicious" of child abuse. Quick inquiry of the people possibly re-

sponsible, the parents and the baby-sitter, failed to discover how the injury was sustained. The defendants consulted with superiors, obtained a court order, and executed it only after the parents refused to permit a temporary interruption of their custody. The issue is not whether it was absolutely essential to remove the child or whether a more sensitive course might have been to leave the child hospitalized pending further investigation. *The issue is whether it was objectively reasonable for the defendants to make the decision they made, and no rational jury could find that it was not.*

*Id.* at 866 (footnote omitted) (emphasis added).

On the undisputed facts of *van Emrik*, it was objectively reasonable for the state social workers to believe that their interference in family integrity was within constitutional bounds. *See also Cecere v. City of New York*, 967 F.2d at 829 (child welfare supervisor entitled to qualified immunity where interference with parent's custody of child was supported by objectively reasonable belief that emergency existed). In the present case, by contrast, the relevant facts are disputed: the evidence submitted by the plaintiffs, if believed, tends to show no objectively reasonable basis for the decisions to substantiate and publish the charge of abuse against Wilkinson.

Plaintiffs have submitted evidence that Adams conducted an extraordinarily shoddy and unprofessional investigation of the report of child sexual abuse received from Wiegand and Balsam, that the record before him did not reasonably support the finding that Wilkinson had abused his sons, that Russell knew or should have known that the abuse finding was not reasonably supported, that both Adams and Russell ignored and concealed exculpatory evidence, and that both

Adams and Russell substantiated and reported to others their finding (even after the substantiation was withdrawn by stipulation), knowing that the probable result would include the criminal prosecution of Wilkinson and his loss of custody over the children. Taking this evidence as true and drawing all justifiable inferences in favor of the plaintiffs, as required for summary judgment purposes, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 255, 106 S.Ct. at 2514, the evidence is sufficient to prove it is more likely than not that Russell and Adams violated the clearly established constitutional rights of the plaintiffs to be free of the state's arbitrary interference in their familial relationships, and further that it would not be objectively reasonable for the defendants to believe their conduct was within constitutional bounds. Accordingly, on this record, Russell and Adams are not entitled to summary judgment on the federal counts.

### b. State Law Qualified Immunity

 Resolution of the claim that Russell and Adams are entitled to summary judgment on the state law counts on qualified immunity grounds follows rather easily from the above discussion. Vermont law affords immunity from civil liability to state officials and employees: the state's highest executive officers receive absolute immunity when they are acting within their authority; lower-level state employees (like Adams and Russell) are entitled to qualified immunity when they are " '(1) acting during their employment and acting, or reasonably believing they are acting, within the scope of their authority; (2) acting in good faith; and (3) performing discretionary, as opposed to ministerial acts.' " *LaShay v. Dept. of Social and Rehabilitation Services*, 160 Vt. 60, 65, 625 A.2d 224 (1993) (quoting *Levinsky v. Diamond*, 151 Vt. 178, 185, 559 A.2d 1073 (1989)).[2]

---

**2.** It may be noted that actions challenging official misconduct in Vermont typically must be brought against the state itself, pursuant to 12 V.S.A. § 5602(a), which provides:

When the act or omission of an employee of the state acting within the scope of employment is believed to have caused damage to property, injury to persons, or death, the exclusive right of action shall lie against the state of

Vermont; and no such action may be maintained against the employee or the estate of the employee.

Section 5602(b), however, exempts "gross negligence or willful misconduct" from the above exclusivity rule. Plaintiffs allege, at least in part, that Adams and Russell were grossly negligent and willful, thus avoiding dismissal under § 5602(a).

■ "Good faith," the second element of the defense, is measured by the "objective test" expressly adopted from federal law as set forth in *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). *Levinsky v. Diamond,* 151 Vt. 178, 190, 559 A.2d 1073 (1989). Thus, as under federal qualified immunity,

> [g]ood faith exists where an official's acts did not violate clearly established rights of which the official reasonably should have known. This good faith inquiry does not ask whether plaintiff's rights were violated, but rather whether the official reasonably should have known that what she was doing violated plaintiff's rights.

*Murray v. White,* 155 Vt. 621, 630, 587 A.2d 975 (1991) (footnote and citation omitted). For purposes of state law qualified immunity, however, the "clearly established rights" need not be *federal* constitutional or statutory rights, as required in the application of the federal qualified immunity defense; to overcome the state law defense it is sufficient to show that the state employee's acts violated clearly established *state* law of which the employee reasonably should have known. *Id.* at 630 n. 4, 587 A.2d 975. State law, of course, includes the common law of negligence. "Qualified immunity from tort liability will not be made to depend upon whether the tort has been codified." *Id.*

From the discussion in section 4(a) of this Opinion above, it follows a fortiori that there are material facts in dispute precluding summary judgment on qualified immunity grounds as to the plaintiffs' state tort law claims. Plaintiffs' evidence tends to show that the conduct of Russell and Adams was grossly negligent under state law and that it was not objectively reasonable for Russell and Adams to believe otherwise. *See La-Shay,* 160 Vt. at 66–67, 625 A.2d 224 (SRS supervisor not entitled to summary judgment on qualified immunity grounds where evidence showed he neither reported nor investigated allegations that plaintiff's foster parent had previously requested sex with a minor).

Russell and Adams rely principally on *Murray v. White,* a decision of the Vermont Supreme Court holding that an SRS caseworker was entitled to summary judgment on qualified immunity grounds. 155 Vt. at 629, 587 A.2d 975. The case only underscores, however, why summary judgment is not appropriate in the present context.

The plaintiff in *Murray* was accused of molesting two neighborhood girls, ages seven and ten. *Id.* at 623, 587 A.2d 975. The defendant SRS caseworker interviewed the girls and their parents and prepared them for testifying against the plaintiff before the Parole Board. The Board later found insufficient evidence to support the charge. *Id.* at 624, 587 A.2d 975. In his suit, the plaintiff alleged that the caseworker's investigation was one-sided and insufficiently thorough, and that she had manipulated the interviews with the children in a biased and misleading way. *Id.* The trial court denied the caseworker's motion for summary judgment as to the plaintiff's state law claims. *Id.* at 624–25, 587 A.2d 975.

The Supreme Court reversed, holding that the plaintiff "failed to show that defendant should reasonably have known that her acts violated plaintiff's rights." *Id.* at 630, 587 A.2d 975. In accordance with statutory requirements, the caseworker had immediately undertaken an investigation upon receiving the report of abuse, and the manner and extent of her investigation was consistent with the statute (33 V.S.A. § 4915) and the SRS policy manual. *Id.* at 631–32, 587 A.2d 975. The Court also noted it was "undisputed that both of the alleged victims in their statements indicated that they had been sexually molested by plaintiff." *Id.* at 632, 587 A.2d 975. Under the circumstances,

> [d]efendant should not have reasonably known that she was obligated to investigate any further than she did. In addition, defendant should not have reasonably known that the manner of her investigation violated plaintiff's rights.

*Id.*

These are essential points, which highlight where *Murray* diverges from the present case. Here, the powerful evidence of maternal coaching and attempts by Ben to recant the allegations (evidence apparently absent in *Murray* ) make it at least a matter of

dispute for resolution by a factfinder whether Adams should reasonably have known that he was obligated to investigate further than he did prior to substantiating the charge against Wilkinson. Similarly, the technical shortcomings evident in the transcribed interview with Ben create a factual issue whether Adams should reasonably have known that his investigation was so professionally deficient as to violate the plaintiffs' state law rights. These matters simply cannot be decided by summary judgment.

Russell's and Adams's motion for summary judgment (paper # 21) is accordingly DENIED.

### 5. Russell's and Adams's Motion for Summary Judgment with respect to Intentional Infliction of Emotional Distress

Russell and Adams brought this motion after receiving clarification as to Count VIII of the original complaint. They seek dismissal on the grounds that they are entitled to qualified immunity and that plaintiffs have failed to state a cause of action for intentional infliction of emotional distress. As to the former, summary judgment on the basis of qualified immunity is unwarranted on this record for the reasons set forth in the preceding section of this Opinion. As to the latter, plaintiffs have adequately alleged and supported the elements of this tort as explained above in section 3(d) of this Opinion.

The motion (paper # 41) is accordingly DENIED.

### 6. Plaintiffs' Motion for Summary Judgment

■ Plaintiffs have filed a motion for summary judgment in which they ask for rulings in their favor on the following issues: (1) that Balsam owed Wilkinson a duty of care as a matter of law; (2) that plaintiffs have properly set forth claims for which relief can be granted; and (3) that defendants are not immune, as a matter of law, from liability or suit. These are requests for *rulings* as to certain issues (all of which are discussed in preceding sections of this Opinion); they are not truly requests for *judgment* as contemplated by Rule 56.

Plaintiffs' motion (paper # 35) is accordingly DENIED.

### 7. Balsam's Motion for Sanctions

Balsam filed a motion for sanctions against Ben because he failed to appear for a scheduled deposition on July 14, 1994. In light of Wilkinson's representations that Wiegand has disappeared with Ben, the motion (paper # 39) is DENIED.

### 8. Russell's and Adams's Objections to Plaintiffs' Interrogatories and Requests to Produce

Objections were raised to plaintiffs' discovery requests served on or about July 14, 1994, on the ground that discovery should be stayed until the threshold immunity issue is resolved. Subsequently, on August 22, 1994, this court granted an application to enlarge the discovery period, ordering that the discovery schedule need not be filed pending disposition of the summary judgment motions. The objections (paper # 54) are moot in light of the August 22, 1994 order.

As all pending motions are resolved herein, and upon the filing of responsive pleadings by SRS and Jeffords, the parties are directed to file a joint discovery schedule in accordance with Local Rule No. 4.

### CONCLUSION

The following orders are hereby entered:

1. Plaintiffs' motion to join parties and to amend complaint (Paper 38) is GRANTED.

2. Defendants' motion for more definite statement (Paper 25) is DENIED.

3. Defendant Balsam's motion for summary judgment (Paper 5) is DENIED.

4. Defendants Russell's and Adams's motion for summary judgment (Paper 21) is DENIED.

5. Defendants Russell's and Adams's second motion for summary judgment (Paper 41) is DENIED.

6. Plaintiffs' motion for summary judgment (Paper 35) is DENIED.

7. Defendant's motion for sanctions (Paper 39) is DENIED.

8. Defendants' objections to discovery requests (Paper 54) are DENIED as moot.