973 F.Supp. 437 (1997)
Thomas WILKINSON and Benjamin Wilkinson, By and Through his father and guardian, Thomas WILKINSON, and Jonathan Weigand, by and through Thomas Wilkinson, his legal guardian Plaintiffs,
v.
Caroline S. RUSSELL, James Adams, Gerald Jeffords, Defendants.
No. 2:94-CV-175.
United States District Court, D. Vermont.
July 31, 1997.
*438 Harold B. Stevens, III, Stevens Law Office, Stowe, VT, for Thomas Wilkinson, Benjamin Wilkinson, Jonathan Wiegand.
Ritchie E. Berger, Shapleigh Smith, Jr., Dinse, Erdmann, Knapp & McAndrew, Burlington, VT, for Stephen Balsam, M.D.
Jeffrey L. Amestoy, Atty. Gen., Vermont Attorney General's Office, Montpelier, VT, Harrison Bruce Lebowitz, Vermont Attorney General's Office, Dept. of Social & Rehab. Services, Waterbury, VT, for Carolyn S. Russell, James Adams.
Harrison Bruce Lebowitz, Vermont Attorney General's Office, Dept. of Social & Rehab. Services, Waterbury, VT, for Vermont Dept. of Social and Rehabilation Services, Gerald Jeffords.

OPINION AND ORDER
SESSIONS, District Judge.
This matter is before the Court on Defendants' Russell, Adams, and Jeffords Motion for Summary Judgment on Count I (Libel and Slander), Count II (Negligence), Count V (Deprivation of Civil Rights), Count VI (Denial of Due Process), Count VII (Conspiracy), Count VIII (Infliction of Emotional Distress), and Count IX (Negligence Per Se). This opinion concerns only the allegations set forth in Count I (Libel and Slander), Count VII (Conspiracy), and Count IX (Negligence Per Se). The Court has already ruled on the remaining counts. For the reasons that follow, Defendants' Motion for Summary Judgment in relation to Counts I, VII, and IX is granted.

BACKGROUND
The following facts are either not in dispute or are supported by the affidavits and accompanying evidentiary material submitted by the Plaintiffs, as required by Fed.R.Civ.P. 56(e).[1] Plaintiff Thomas Wilkinson claims the Defendants, employees at Vermont Social and Rehabilitative Services ("SRS"), failed to investigate properly allegations that he sexually abused his son, Benjamin Wilkinson (Ben), and his step-son, Jonathan Weigand. Consequently, he was falsely accused of being a sex offender. He further contends they improperly communicated their findings to others.
On June 30, 1993 Judge Herbert Barall, the presiding judge in the child custody dispute *439 between Wilkinson and his former wife Linda Weigand ("Weigand") in Connecticut, ordered that the Connecticut Department of Children and Families ("DCF") communicate with Vermont SRS regarding Wilkinson's children.[2] The Attorney for DCF cited the Uniform Child Custody Jurisdiction Act,[3] the statute which provides uniform requirements for the exchange of information and mutual assistance between different state courts concerned with the same child. Wilkinson's attorney, who was present in the courtroom, did not object to the Judge's order. On July 13th Caroline Russell, SRS District Director in the Morrisville office, returned a phone call from Paul Shanley of Connecticut DCF. Shanley told her he had been ordered by the Connecticut court to contact SRS to obtain information to answer the Judge's concerns regarding the welfare of the children. He specifically asked for some documentation that he could provide to the court. According to Shanley's report to Judge Barall, Russell provided him with information about the case over the phone, including the substantiation of abuse charges against Wilkinson. Russell then contacted an attorney at the Deputy Attorney General's office, who advised her that SRS had a responsibility to provide DCF with information about SRS's involvement in the case.
On July 15, 1993, in response to Shanley's request, Russell wrote to the Connecticut DCF. She began the letter by writing:
It is my understanding that there is a question in the Family Court in Connecticut about which parent should have custody of these boys. In the interest of protecting Jon and Ben from further harm and abuse, I have been advised by our department's attorney that I am able to disclose the outcome of our investigations to you.
She went on to state again that SRS had "made a substantiation of sexual abuse perpetrated on Ben by Thomas Wilkinson" and had also "made a determination that sexual abuse was perpetrated on Jonathan by Tom Wilkinson." Russell provided this information despite a written consent agreement that had been entered into on May 3, 1993 between Wilkinson and SRS in which SRS had consented to "stay" an appeal process Wilkinson had begun to the Human Services Board pending the outcome of criminal and divorce litigation. The agreement provided, "In the interim, SRS will remove *440 Wilkinson's name from its central registry as well as its substantiation of sexual abuse against him." Wilkinson claims he was slandered by Russell's remarks in the phone call and libeled by the content of the letter.

DISCUSSION

I. LIBEL AND SLANDER

To establish a cause of action in defamation in Vermont, a plaintiff must prove that a defendant 1) made a false and defamatory statement concerning the plaintiff, 2) acted with some negligence or greater fault in publishing the statement, 3) published the statement to at least one third person, 4) was not privileged in the publication of the statement, 5) caused plaintiff to suffer special damages, and 6) caused plaintiff actual harm to warrant compensatory damages. Crump v. P & C Food Markets, Inc., 154 Vt. 284, 291, 576 A.2d 441.
Defendants contend that Russell's statements were privileged under the doctrines of judicial immunity and state qualified immunity. They further contend that the statements were not "published" as that term is used in an action for defamation.

a. Judicial Immunity

Vermont law has recognized the doctrine of judicial immunity which applies to judges, attorneys and witnesses since the cases of Torrey v. Field, 10 Vt. 353 (1838), and Mower v. Watson, 11 Vt. 536, 34 A.D. 704 (1839). (See also Banister v. Wakeman, 64 Vt. 203, 23 A. 585 (1891) and Laplaca v. Lowery, 134 Vt. 56, 349 A.2d 235 (1975)). In Torrey v. Field, the Vermont Supreme Court held:
This privilege, or immunity ... extends to parties, witnesses, jurors, judges and counsel, in courts of justice, in short, to anyone, who in the discharge of public duty or in pursuit of private rights, is compelled to participate in the administration of justice.
10 Vt. 353, at 414 (1838).
United States Supreme Court cases indicate that immunity analysis "rests on functional categories, not the status of the defendant." Briscoe v. LaHue, 460 U.S. 325, at 342, 103 S.Ct. 1108, at 1119, 75 L.Ed.2d 96 (1983). Absolute immunity flows not from rank or title, but from the nature of the responsibilities of the individual official. Butz v. Economou, 438 U.S. 478, 511, 98 S.Ct. 2894, 2913, 57 L.Ed.2d 895 (1978). The Court in Briscoe further stated:
In short, the common law provided absolute immunity from subsequent damages liability for all persons governmental or otherwise-who were integral parts of the judicial process.
460 U.S. at 335, 103 S.Ct. at 1115.
Psychiatrists appointed by the court to conduct competency evaluations have been granted absolute immunity on the basis that they "perform functions essential to the judicial process." Moses v. Parwatikar, 813 F.2d 891, 892 (8th Cir.1987). The Eighth Circuit further stated that
Non-judicial persons who fulfill quasi-judicial functions intimately related to the judicial process have absolute immunity for damage claims arising from their performance of the delegated functions ... anything less than absolute immunity would defeat the requirement that the "paths which led to the ascertainment of truth ... be left as free and as unobstructed as possible."
Id., at 892, quoting Briscoe, 460 U.S. at 333, 103 S.Ct. at 1114.
In making the oral and written statements to Shanley, Russell was clearly responding to Judge Barall's order. Other Circuits have held that persons who faithfully execute valid court orders are absolutely immune from liability for damages in actions challenging conduct authorized by the order. Henry v. Farmer City State Bank, 808 F.2d 1228, 1238-39 (7th Cir.1986) (sheriff who acted pursuant to official court order enjoyed quasi-judicial absolute immunity); Tymiak v. Omodt, 676 F.2d 306, 308 (8th Cir.1982) (same); Slotnick v. Garfinkle, 632 F.2d 163, 166 (1st Cir.1980) ("Judicial immunity extends as well to those who carry out the orders of judges."); Kermit Constr. Corp. v. Banco Credito Y Ahorro Ponceno, 547 F.2d 1,3 (1st Cir.1976) (receiver who faithfully and carefully executes a court order shares the judge's absolute immunity) See also Coverdell *441 v. Dep't of Social and Health Services, 834 F.2d 758, 764-65 (9th Cir.1987) (child protective services worker was entitled to absolute quasi-judicial immunity from liability for damages stemming from worker's apprehension of newborn child at hospital pursuant to court order). The rationale for immunizing persons who execute court orders is apparent. Such persons are themselves "integral parts of the judicial process." Briscoe, 460 U.S. at 335, 103 S.Ct. at 1116. As the First Circuit has explained with respect to a receiver who acted pursuant to court directives:
To deny him this [absolute] immunity would seriously encroach on the judicial immunity already recognized by the Supreme Court.... It would make the receiver a lightning rod for harassing litigation aimed at judicial orders. In addition to the unfairness of sparing the judge who gives an order while punishing the receiver who obeys it, a fear of bringing down litigation on the receiver might color a court's judgment in some cases ...
Kermit Constr. Corp., 547 F.2d at 3.
Plaintiffs claim that Russell's statements were made maliciously. The U.S. Supreme Court has held that because the purpose of the rule of absolute judicial immunity is to protect the integrity of the judicial process, even malicious and corrupt acts are protected. Pierson v. Ray, 386 U.S. 547, 554, 87 S.Ct. 1213, 1217-18, 18 L.Ed.2d 288 (1967); Cleavinger v. Saxner, 474 U.S. 193, 199-200, 106 S.Ct. 496, 499-500, 88 L.Ed.2d 507 (1985).
In the instant case, the Court finds that Russell was, in the discharge of her public duty, "compelled to participate in the administration of justice." Torrey v. Field, 10 Vt. 353 (1838). Russell, in her phone call and report to Shanley, was acting pursuant to Judge Barall's order. Accordingly, Russell enjoys absolute immunity from damages allegedly occasioned by her statements.

b. State Qualified Immunity

In Vermont, qualified immunity attaches to lower-level state employees who are "`1) acting during their employment and acting, or reasonably believing they are acting, within the scope of their authority; 2) acting in good faith; and 3) performing discretionary, as opposed to ministerial acts.'" LaShay v. Dept. of Social and Rehabilitation Services, 160 Vt. 60, 65, 625 A.2d 224 (1993) (quoting Levinsky v. Diamond, 151 Vt. 178, 185, 559 A.2d 1073 (1989).
The Vermont Supreme Court has held that good faith exists where an official's acts did not violate "clearly established rights" of which the official reasonably should have known. Levinsky, at 190, 559 A.2d 1073. The good faith question should not ask whether Wilkinson's rights were violated, but rather whether Russell "reasonably should have known that what she was doing violated the plaintiff's rights." Murray v. White, 155 Vt. 621, 630, 587 A.2d 975 (1991).
In this case, the Court finds that Russell did not reasonably know that by communicating with Paul Shanley she was potentially violating Wilkinson's rights under the tort of defamation in Vermont. Russell knew that the information she was communicating to Shanley was confidential.[4] Before writing the letter, she consulted an attorney who advised her that her actions were legal. Consequently, the good faith requirement is met and Russell is also protected by state qualified immunity.

c. Publication

The communication between Russell and her Connecticut counterpart Shanley was confidential under Vermont law. 33 V.S.A. (through Section 111(a) and (b)) expressly provides that information in SRS records shall not be disclosed to anyone except for purposes directly connected with the administration of the department or when required by law. There is no evidence that Russell communicated with anyone but Shanley. In addition, the information was provided to a court in which the proceedings and record were closed to the public. The Court finds that Russell's statements were not "published" and cannot properly form the basis for a claim that the plaintiff was defamed. *442 See Gross v. Haight, 496 So.2d 1225, 1226-28 (La.App.5th Cir.1986) (reports of suspected child abuse were not "published" where communications were kept confidential and were limited to officials who were privileged to receive the information and were necessary to the investigation).
Plaintiffs claim that Linda Wiegand obtained a copy of Russell's letter through the Connecticut Family Court proceeding and distributed the letter to numerous persons including newspaper reporters. Even if this is the case, Russell did not publish the letter. Wilkinson has no cause of action against Russell for the actions of Wiegand.

II. CONSPIRACY

In Adickes v. S.H. Kress & Co., 398 U.S. 144, 152, 90 S.Ct. 1598, 1605-06, 26 L.Ed.2d 142 (1970), the U.S. Supreme Court held that to create a genuine issue of "conspiracy", plaintiffs have to point to at least some facts which would suggest that the defendants "reached an understanding" to violate the plaintiff's rights. These facts must be pled with sufficient specificity to suggest a "meeting of the minds" directed towards an unconstitutional action. Deck v. Leftridqe, 771 F.2d 1168, 1170 (8th Cir.1985).
In Myers v. Morris, 810 F.2d 1437 (8th Cir.1987), no conspiracy was found to have existed among a prosecutor, sheriff, sheriff's deputies, guardians, therapists, a court-appointed attorney and a police officer who had investigated, substantiated and arrested eight plaintiffs on child sexual abuse charges. The Eighth Circuit stated:
A commonly held belief that a crime has been committed is not a conspiracy. Various people engaged in investigating and reporting suspected criminal activity does not amount to a conspiracy. We look for a genuine factual issue of concerted activity towards an unlawful objective.
Id., at 1454.
Clearly there was a commonly held belief among Russell, Jeffords and Adams that a crime had been committed by Wilkinson. However, the Court finds no evidence which suggests any mutual understanding or "meeting of the minds" in any conspiracy to deprive Wilkinson and his son and step-son of constitutional rights.

III. NEGLIGENCE PER SE

Plaintiffs allege that the Defendants were negligent per se in failing to follow the statutory mandates under 33 V.S.A. Chapter 49 regarding the reporting and investigation of reports of child abuse. Paragraph 92(a) through (e) in the amended complaint outlines the allegations.
a. Paragraph 92(a) concerns former Defendant Balsam only.
b. Paragraph 92(b) alleges that Defendant Adams did not interview the children in the presence of a disinterested adult as required by 33 V.S.A. § 4915(b). However, 33 V.S.A. § 4915(b)(2) only requires the presence of a disinterested adult when the interview of the child takes place without the approval of the child's parents, guardian or custodian. Since the children's mother, Weigand, gave permission for Adams to interview her children, there was no violation of Section 4915(b).
c. Paragraph 92(c) alleges that neither Defendant Adams nor Defendant Jeffords fully investigated a report that Weigand sexually abused her nephew. Plaintiffs claim this was in violation of 33 V.S.A. §§ 4913(a)[5] and 4914. Section 4913(a) sets the statutory requirement of reporting suspected child abuse within 24 hours. Section 4914 describes to whom the report should be made, and includes the relevant information the report must contain.
The facts reveal that Craig Martin, Weigand's brother-in-law, called a "hot line" number he got from the phone book "some time in January, 1993", and spoke to a woman who he thinks was in "law enforcement".[6] He told her his two year old son had told him that Weigand (the child's aunt) had touched his privates. This woman, upon hearing this, would have had the statutory responsibility to contact SRS and make a report within 24 *443 hours. There is no evidence indicating that she did or didn't make the report. On January 27, the State's Attorney's office called Adams and informed him of the allegation.
Plaintiffs do not include 33 V.S.A. § 4915 in this claim. Section 4915 sets out the standards for investigating suspected child abuse. Regardless, the facts establish that Adams called Craig Martin on February 2, 1993 in an attempt to begin an investigation. Martin refused to let Adams speak with his child. Martin and his wife also told Adams that they had concluded that no abuse had taken place.
d. Paragraph 92(d) alleges that the SRS Defendants did not report or investigate Wilkinson's complaint of Weigand's abuse or neglect of the children as required by sections 4913(a), 4914, or 4915. According to paragraph 34 of the Amended Complaint, Wilkinson is referring to the assertion he made during his SRS appeal hearing that the boys were being coached by Weigand. 33 V.S.A. sections 4913, 4914, and 4915 require that reports of "child abuse"[7] be reported to the commissioner and investigated. There is no evidence that the Defendants had any information which would lead them to believe Weigand's alleged coaching rose to the level of child abuse that mandated reporting and investigation under Vermont law. Further, there is evidence that Adams spoke to Dr. Stephen Balsam about the issue of Ben being coached by Weigand, as well as the possibility that Weigand had been her son's victimizer. Dr. Balsam told Adams he saw no evidence of coaching, and that he was not suspicious of Weigand as being the abuser.
e. Paragraph 92(e) alleges that Russell violated 33 V.S.A. Section 4916 in disseminating information about child abuse. As stated above in relation to the allegation of defamation, the Court has found that Russell's remarks were privileged under the doctrines of judicial immunity and state qualified immunity, and were not "published" as required in an action for defamation. Accordingly, there can be no violation of Vermont law in relation to this claim.

IV. CONCLUSION

Defendant's Motion for Summary Judgment (paper 161) in relation to Count I is GRANTED.
Defendant's Motion for Summary Judgment (paper 161) in relation to Count VII is GRANTED.
Defendant's Motion for Summary Judgment (paper 161) in relation to Count IX is GRANTED.
NOTES
[1] Familiarity with the facts of this case as set forth in the Court's previous opinion is assumed. Wilkinson v. Balsam, 885 F.Supp. 651 (D.Vt. 1995). Additional facts concerning Count 1 (Libel and Slander) are included in this opinion.
[2] Relevant portions of court transcripts for June 30, 1993 and July 7, 1993 are reproduced below:

June 30, 1993:
The Court: I'd like to continue till next Wednesday and I want a representative from DCYS (DCF) here.
Attorney Benedict (Counsel for the minor children): On Wednesday, your honor?
The Court: Yeah, even if they have to be subpoenaed ... we will get somebody here. And will you tell Attorney Perlman (counsel for DCF) that I smell a potentially serious problem with this child. That I think they have a statutory obligation that has to be met. And that I want somebody here who has the authority ... it doesn't have to be the commissioner that comes but I want somebody here who has the authority ... District Director ... who has the capacity to say, we're going to do what has to be done in accordance with the responsibility under the statute.
6/30/93 Transcript at 11-12 (Paper 161, Att.1)
July 7, 1993:
Mr. Shanley: Your honor, my name is Paul Shanley. I'm the Program Supervisor in the New Britain sub-office which is part of the Hartford region. I'm here at the request of our regional administrator, Judy Roy (phonetic) ...
Attorney Benedict: The State of Vermont does not have an active equivalent of a Child and Family Services file, I've reported that to the Court last week.
The Court: Yes I know, last week ...
Attorney Elgo (From Attorney General's office, representing DCF): Your honor, if I may, it's my understanding under the UCCJA (Uniform Child Custody Jurisdiction Act) the Court may be able to ask for a social study of some report from the Vermont Social Services. Our problem is that they were not cooperative with us.
The Court: It seems to me that I want the name ... you gave the name as Mr. Adam ... but it seems to me that if they don't want to cooperate I want a communication between the top of your department to the top of their department to say what's going on.
7/7/93 Transcript at 8 (Paper 161, Att. 2)
[3] Section 1048 of the Uniform Child Custody Jurisdiction Act reads:

1048. Assistance to courts of other states
(a) Upon request of the court of another state the courts of this state which are competent to hear custody matters may order a person in this state to appear at a hearing to adduce evidence or to produce or give evidence under other procedures available in this state.
[4] 33 V.S.A. Section 306(a) (through Section 111(a) and (b)).
[5] The plaintiffs mistakenly cite 33 V.S.A. § 4913(1).
[6] Deposition of Craig Martin at 24-29 (Paper 162, Att. 14).
[7] 33 V.S.A. section 4912 reads:

4912. Definitions
(2) An "abused or neglected child" means a child whose physical or mental health or welfare is harmed or threatened with harm by the acts or omissions of his parent or other person responsible for his welfare or a child who is sexually abused by any person.
(3) "Harm" to a child's health or welfare can occur when the parent or other person responsible for his welfare:
(A) inflicts, or allows to be inflicted upon the child, physical or mental injury; or
(B) commits or allows to be committed against the child, sexual abuse; or
(C) fails to supply the child with adequate food, clothing, shelter or health care ...; or
(D) abandons the child.